**H. N. BAILEY & ASSOCIATES**

v.

**The UNITED STATES.**

No. 266–70.

United States Court of Claims.
Oct. 15, 1971.

William R. Pardee, Los Angeles, Cal., for plaintiff; James W. Booth, Los

Angeles, Cal., attorney of record, Booth & Bush, Los Angeles, Cal., of counsel.

Joseph F. DiStefano, Washington, D. C., with whom was Asst. Atty. Gen., L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

DURFEE, Judge:

This is a contracts case wherein plaintiff seeks to recover assessed and collected excess reprocurement costs. In addition, plaintiff prays for a declaration that the Government's termination for default is converted into a termination for the convenience of the Government.

Operation Henhouse is an aerial recovery program that is conducted by the U. S. Air Force as part of our space and missile program. The instant procurement required the production and delivery of manganese bronze pole hooks and manganese bronze loop hooks. These hooks are employed by moving aircraft for the purpose of securing returning packages of scientific instruments. They engage the shroud lines of the parachutes carrying the load to be recovered and thereby prevent the instrument package from descending into the ocean.

The contract proffered in defendant's Request for Proposals (hereinafter RFP) was for an indefinite quantity, specifying only a minimum and maximum for each item.[1] The first delivery of item 1 (pole hook) was to take place sixty days from the receipt of the order, and the first delivery of item 2 (loop hook) was scheduled for thirty days from the receipt of the order. The RFP requested separate quotations for the minimum quantities and for the optional quantities beginning with 50 units and ending with a quotation for the total optional quantity. A complex method of evaluating which total quotation was the lowest was described and illustrated by means of an example using a unit price of $10.

Plaintiff, a California corporation, submitted low bid, and eventually was awarded the contract. The procurement, which was designated a 100% small business set-aside, was the first for these hooks which was opened for competitive negotiation. The hooks were originally developed in 1959 by All American Engineering Co. of Wilmington, Delaware (hereinafter All American) as subcontractor for Lockheed Aircraft Company. Prior to this procurement, they were produced and delivered by All American as a sole source supplier.[2]

Plaintiff's low bid proposed $25 as the unit price for each hook. All American's bid was second lowest, at unit prices of $85.50 and $81.00 respectively, and Brandt's Foundry (hereinafter Brandt), the reprocurement contractor, was third lowest at unit prices of $113.50 and $106.-20.[3] Thus, plaintiff's bid was approximately 30% of the next lowest bid.

The urgency of the program and the wide disparity in bid quotations between those submitted by plaintiff and the other bidders prompted the procuring agency to request a pre-award survey. It was immediately conducted by the Defense Contract Administrative Services Region

---

1. The contract was to be executed for a minimum of 100 and a maximum of 350 pole hooks, and a minimum of 250 and a maximum of 500 loop hooks.

2. All American was party to at least two sole source contracts, in June 1963 and February 1966. The price per unit ranged from $80–$85. The contract terms provided for the delivery of 25 to 30 units per month after receipt of orders in 1963, and for the delivery of 60 units within 60 to 90 days after receipt of orders in February 1966. The total quantity of hooks which were to be supplied by All American ranged from approximately 100 for loop hooks to 245 for pole hooks.

3. The other bidder who responded to defendant's RFP originally entered prices which were three times as high as those submitted by Brandt, and belatedly reduced its proposed prices. to $82.50 and $77.89 per unit.

(DCASR), Los Angeles, in June 1966. There is conflicting testimony whether plaintiff was informed at this time, either directly or indirectly, that its bid was only 30% of the next lowest bid.[4] However, it is undisputed that plaintiff was asked to confirm its bid and did, in fact, confirm its proposed prices by letter of June 3, 1966.

The award document, which was received by plaintiff on June 27, 1966, provided for the delivery of 350 pole hooks and 500 loop hooks. In accordance with the conditions outlined in the RFP, the following delivery schedule was initiated:

|                    | Item 1 | Item 2 |
|--------------------|--------|--------|
| 27 July 1966       |        | 100    |
| 26 August 1966     | 100    | 150    |
| 10 October 1966    | 50     | 50     |
| 25 October 1966    | 200    | 200    |
|                    | 350    | 500    |

The contract contained an index of General Provisions for Fixed-Price Supply Contracts which incorporated by reference ASPR clauses on disputes, default and convenience termination.

There was no provision for the delivery and/or testing of a preproduction model (sometimes referred to as a first article).

Both recovery hooks were to be cast in a manganese bronze alloy,[5] which was required to attain a tensile strength of at least 100,000 psi (pounds per square inch) and a minimum elongation in two inches of 12%. There can be no doubt that manganese bronze of high tensile strength, although not a metallurgical novelty, is exceedingly difficult to pour. This is especially true where the castings are subject to x-ray inspections for defects such as porosity and shrinkage.[6] Under these strict control conditions, only the most sophisticated melting and poring processes can be used. Success in pouring a manganese bronze alloy with the desired strength depends almost entirely upon the foundry's ability to achieve the correct copper; zinc; aluminum; iron ratio. That is to say, each metal must be added in compatible proportion to all the other components of the alloy. To insure the proper metallic ratio, precise temperature control, the positioning of gates, risers and chills,[7] and

---

4. At the hearing before the Board, defendant's representative, who conducted the pre-award survey, testified specifically that plaintiff's president was shown and read Government Form 1524, a request for a pre-award survey, which outlined the factors that were to be reviewed with plaintiff, including in this case, the fact that plaintiff's bid was approximately 30% of the next lowest bid. Almost immediately thereafter, plaintiff's president returned to the witness stand and took direct issue with the preceding testimony. He stated that he did not recall being told that his bid was 30% of the next lowest bid, and that if he had seen this fact on the form shown to him, he would have remembered it. Transcript before the ASBCA (hereinafter Transcript) at 269–71, 276–77, 282–84.

5. Manganese bronze was first employed in modern technology toward the end of the 18th century. As described in the Government specification, it is an alloy of 60–65% copper, 3–7.5% aluminum, 2–5% iron, 2.5–5% manganese, traces of tin and lead, and the balance of 17.1–31.1% zinc. Aluminum and zinc are added to the alloy to give it strength. Manganese is added to the bronze for grain refinement which improves the physical properties of the metal.

6. Defendant's mechancal engineer in support of procurement testified that Operation Henhouse was a high integrity program. This means, that because of the urgency and critical nature of the work being done in the program, defendant would not accept any procured article which evinced even the slightest deviation from the normal tolerances which were inherent in the Government specification. Transcript at 226–27, 231–33.

7. In order to maintain the metallic ratio which determines the strength of the alloy, the hot liquified metal must cool and solidify in a uniform manner. In order to maintain the proper temperature which allows for this "directional" or "progressive" solidification, pieces of cast iron or some carbon product are placed on the bottom of the castings to quicken the solidification rate. These cooling aids are called "chills." In addition, "gates" and "risers" are used when the metal is poured into the castings

the correct application of certain other technical steps are of prime importance. For example, if the pouring temperature of the metal during the casting process is too cold, shrinkage may occur. If the pouring temperature is too hot, certain elements of the alloy will be "burned out" (oxidized), thereby disrupting the delicate metallic ratio.

In 1966, plaintiff was primarily a manufacturer of spare parts, overhaul kits and related support equipment for various military services. In order for it to participate in the instant procurement, it was necessary to retain the services of an independent foundry which was capable of casting the manganese bronze alloy to specification. The unfinished castings would be transferred to plaintiff who, in turn, would polish and finish them at its plant and finally deliver them to defendant in accordance with the contract delivery schedule. Plaintiff employed the Advance Aluminum & Brass Co. (hereinafter Advance) as subcontractor for this foundry work. During the course of the pre-award investigation, plaintiff was assured by the foundry's owner that the castings would be supplied well within the time allotted by the RFP. Subsequently, Advance undertook to subcontract for the designing of the required patterns both of wood and aluminum.

As production began and the first delivery date (July 27) drew near, there was no indication from plaintiff that it was encountering any unforeseen difficulties. The only request it made for additional information or assistance was for extra copies of the drawings which defendant promptly furnished.

On July 26, defendant's engineer, who was visiting plaintiff's plant in connection with a pre-award survey for another

contract, undertook to survey plaintiff's progress with respect to the instant procurement. He spoke with plaintiff's president and visited the foundry and pattern shop. He learned that at least ten additional days were needed to complete the patterns, and that the pattern shop had not been instructed to give priority to item 2 which required delivery earlier than item 1.

Thereafter, on August 10, the administrative contracting officer notified plaintiff of its default in meeting the first delivery date, and gave it ten days to advise the procuring agency of any reasons why the contract should not be terminated. The concluding paragraph of the letter stated:

> Any assistance rendered to the Contractor on this contract or acceptance by the Government of delinquent goods or services hereunder will be solely for the purpose of mitigating damages, and is not to be construed as an intention on the part of the Government to condone any delinquency or as a waiver of any rights the Government may have under subject contract.

A meeting was held on August 12 and 13 between plaintiff's president and defendant's representatives. According to the somewhat conflicting testimony, plaintiff's president brought to the meeting an unfinished sample of item 1 and a polished sample of item 2. He recited the tensile strength problem and other deficiencies encountered during production which accounted, in part, for the delay in delivery. Defendant's engineer thereupon commented that the reddish color of the samples recalled hooks which had been produced earlier by a contractor who was unable to resolve a similar tensile strength problem until the hooks attained a higher yellow color.[8] At that

to insure a continuous flow into the mold and uniform solidification into the desired shape.

8. The testimony, in regard to the comments made at this August meeting concerning the color of the hooks, is particularly confusing. Although there was general agreement that defendant's engi-

neer, Mr. Dodgin, did make such a comment, there was no agreement as to the identity of the early contractor who had encountered this problem. Plaintiff's president testified that Mr. Dodgin had commented that All American had experienced a similar "cycle of problems" and that it wasn't until they had obtained a higher brass color, by altering

point, plaintiff's president requested a sample or other technical or descriptive information relating to the production of those earlier hooks. He was informed, however, that no samples, physical or chemical reports or analyses, or other technical information were in existence. It was finally agreed that the Government would examine and test any of plaintiff's work product which was submitted during production, and otherwise render any reasonable assistance requested.

On August 19, plaintiff formally responded to the default notice of August 10 by stating that it was already "producing parts of the high quality required." The letter confidently predicted that parts would be delivered by the time the letter was received by defendant, and that the program would be completed "on schedule by the end of next month."

Despite these optimistic projections, plaintiff was again in default for item 1 and item 2 on the second scheduled delivery date (August 26). On September 2, plaintiff advised the engineering adviser of the procurement contracting officer (C.O.), that it was sending a "representative production article of item 2 * * *" for inspection and evaluation.

In the absence of any deliveries promised by plaintiff's August 19 letter, the contract was terminated for default on September 6, 1966. Upon receipt of the notice of termination, plaintiff ceased all production activities. On the same day the contract was terminated, defendant's engineering adviser received the

sample loop hook which had been mailed by plaintiff. Although he was fully informed of the termination proceedings, it was decided, nevertheless, to test the sample and report the results to plaintiff. Said tests were performed, and plaintiff was advised on September 29 that the sample was defective both in its physical properties and in the dimensions of critical areas.

The Government promptly solicited bids from All American and Brandt, and eventually negotiated a reprocurement contract with the latter.[9] During the course of production, the configuration of the pole hooks was modified slightly, and the contract price was increased proportionately.[10] As a result of this reprocurement, $33,228.25 in excess costs were assessed against plaintiff and collected.

In accordance with the Disputes Clause of the instant contract, an appeal was perfected to the Armed Services Board of Contract Appeals (hereinafter the Board or ASBCA), which rendered a decision adverse to plaintiff on August 19, 1968. Plaintiff's subsequent motion for reconsideration was granted, and the Board's prior decision was thereupon confirmed on October 30, 1968.

Plaintiff sought timely review before this court exclusively under the terms of the Wunderlich Act, 41 U.S.C. §§ 321–322 (1964), and the case comes directly before the court on plaintiff's motion and defendant's cross-motion for summary judgment, by virtue of Rule 166(b).

Plaintiff raises four issues which were considered by the Board and resolved adversely to plaintiff's contentions.

the proportions, of the metallic ingredients of the alloy, that the alloy was able to satisfy the tensile strength requirement. However, Mr. Dodgin testified that his comment was directed to problems that Brandt had encountered in casting an intermediate hook in association with the McClellan Foundry, and that he was not familiar at all with the All American procurements. or any problems that company might have encountered. Despite this testimony, the Board, in recitation of the facts, attributed this comment to the prior All

American procurements. Transcript at 28–30, 107–111, 207, 215–17.

9. The Board found that the technical terms of the reprocurement contract were identical and the delivery schedule was comparable. Although some deliveries were late, all hooks ordered from Brandt were eventually delivered.

10. The amendment also provided for the shipment of 14 redesigned hooks to the procuring activity for further tests and re-shipment. None of the hooks tested were found to be defective.

We have considered each issue separately, and we conclude, for reasons which follow, that the Board's findings are neither arbitrary nor capricious, nor grossly erroneous, but are, in fact, supported by substantial evidence.

### Undisclosed Information

Plaintiff's first contention is that defendant improperly withheld superior knowledge and other vital information which would have substantially expedited plaintiff's production. To the contrary, the Board concluded that at the time the instant contract was executed, defendant did not possess technical data or knowledge of metallurgical casting processes which constituted superior knowledge. This conclusion was grounded on findings that the information plaintiff alleges was improperly withheld did not exist, and that the information plaintiff required to expedite production was readily accessible within the industry and in available resources such as textbooks and other scholarly works.

According to the testimony adduced at the hearing, two companies had experience in casting a similar manganese bronze alloy prior to the instant procurement. All American, the previous Government supplier, was party to at least two sole source contracts for the same recovery hooks. In addition, there was testimony to indicate that defendant's representatives at McClellan Air Force Base had cast a similar hook at the Government foundry in association with Brandt, the reprocurement contractor (hereinafter the Brandt-McClellan hook or the Brandt-McClellan procurement). This latter procurement was for an intermediate hook, somewhat larger than plaintiff's, but similar in basic design and production techniques. However, the administrative record does not support plaintiff's contention that defendant derived superior knowledge by means of these prior procurements.

Plaintiff asserted that any knowledge gained from All American's previous experience with this complex alloy would have been of immeasurable aid to plaintiff's production under the contract. Quite significantly, however, plaintiff was unable to introduce any evidence of the existence or content of physical or chemical test reports or other technical data describing the All American procurement. On the other hand, defendant's counsel stated unequivocally, and without contradiction, that no such evidence existed at the time of the hearing or was in existence at the time the contract was let.[11]

With respect to the Brandt-McClellan procurement, the record is less clear. Plaintiff argues that defendant's ability to relate the alloy's color to its ultimate tensile strength (at the Aug. 12 meeting) is positive proof of superior knowledge which it did not share with plaintiff. As indicated earlier, there is a conflict as to which earlier procurement defendant's comment was directed. We will assume, however, for purposes of this argument, that defendant's comment was made in reference to the Brandt-McClellan hook.[12] First, as to when this casting was made at McClellan, the only pertinent testimony was submitted by Mr. Dodgin (defendant's engineer), who testified that the Brandt contract for an intermediate hook *was awarded* in "the first two or three months of '66, March or April * * *", and Mr. Gavaldon (Chief of the materials and processing lab at McClellan), who testified that he first saw the Brandt-McClellan hook approximately three years prior to the February 1968 ASBCA hearing. However, there was no testimony which specified at what time, or at what point during production, the tensile strength problem was first encountered or solved. More importantly, although Mr. Dodgin conceded that he was aware of the problem, there is not a scintilla of evidence in the administrative

11. Transcript at 39–42.

12. We note that plaintiff adopted this rendition of the incident in its motion for summary judgment despite its earlier insistence that All American was the contractor in question and the Board's adoption of that position.

record that he possessed knowledge of how the problem was ultimately resolved, or that any test reports or records were kept at all. Even assuming, *arguendo,* that the tensile strength problem of the prior contractor was solved prior to the instant contract, and that Mr. Dodgin was somehow privy to its resolution, it is unrealistic to believe that Mr. Dodgin could have supplied, from memory, precise instructions for the resolution of an admittedly complex metallurgical casting problem. Thus, plaintiff's argument depends upon conjecture and a great number of variables which were not proven at the hearing, and which the Board could not assume in the absence of supporting evidence. For this reason, we hold that the Board's conclusion that defendant possessed no superior knowledge is supported by substantial evidence.

The Board found further that the information plaintiff needed to fulfill its obligations under the contract was accessible within and without the industry. The expert metallurgists and engineers on both sides agreed that the properties of the alloy and the processes for its casting are fully discussed in textbooks and other scholarly works. Plaintiff's own witness testified that in the Los Angeles area alone, there were approximately 55 foundries which were capable of making non-ferrous metal alloys and of those 55, at least five or six, including the foundry employed by plaintiff, would be capable of casting this copper manganese alloy to specification.[13]

It is for these reasons that plaintiff's strong reliance on Helene Curtis Industries, Inc. v. United States, 312 F.2d 774, 160 Ct.Cl. 437 (1963), is misplaced. That case involved two contracts to supply large quantities of a disinfectant chlorine powder. The active ingredient of the disinfectant was chlormelamine, which in 1951, was a new and patented chemical whose properties were known only to the Army and the two universities and two chemical companies which collaborated in its development. The Curtis bid was based on the tests it conducted on chlormelamine, prior to bid submission, which led to the belief that grinding was not a necessary part of the manufacturing process. As production proceeded, however, Curtis discovered that in fact, grinding was necessary to produce a product which would meet the solubility standard established in the contract. This led to extensive changes in the company's manufacturing techniques. As a result of this deficiency, and another problem which we need not discuss, Curtis incurred substantial losses on the two contracts and sued the Government to recover its additional expenses.

The court's judgment in favor of the contractor on the issue of undisclosed information was based squarely on the following findings of fact: (1) the Army knew that grinding would in all probability be necessary; (2) on the basis of the data it had or should be expected to obtain, Curtis reasonably expected that *the job could be done by simple mixing,* without grinding; (3) the Army was aware that Curtis expected to produce the disinfectant without grinding; (4) the contract specification did not inform or alert Curtis as to the probable need for grinding; (5) the Army did not otherwise inform Curtis of this fact. On the basis of these findings, the court held defendant liable *"if it breaches an independent duty to reveal data * * *."* Helene Curtis, *supra,* 312 F.2d at 778, 160 Ct.Cl. at 443.

It is clear that defendant's duty in *Helene Curtis* arose out of its conscious omission to share the superior knowledge which it possessed. In other words, the Government violates its contractual obligations if it permits the contractor to bid for a project and subsequently undertake a course of action in pursuance thereof which the Government knows to be defective, provided that the Government possesses knowledge which is vital to the successful completion of the contract, and provided further that it is unreasonable to expect the contractor

13. Transcript at 138–39.

to obtain that vital information from any other accessible source.[14] Of course, the corollary of the *Curtis* rule is that the Government is under no duty to volunteer information in its files if the contractor can reasonably be expected to seek and obtain the facts elsewhere, and this court has so held on previous occasions. Ambrose-Augusterfer Corp. v. United States, 394 F.2d 536, 547, 184 Ct.Cl. 18, 38 (1968); T. F. Scholes, Inc. v. United States, 357 F.2d 963, 970, 174 Ct.Cl. 1215, 1226 (1966); National Concrete and Foundation Co. v. United States, 170 Ct. Cl. 470, 476 (1965); Leal v. United States, 276 F.2d 378, 383, 149 Ct.Cl. 451, 460 (1960).

We believe it is this latter rule which controls the final disposition of this issue. As stated previously, the Board finding that defendant did not possess superior knowledge is well supported in the record, and the only conclusion which can be derived from the testimony of the expert witnesses is that the information necessary for casting a manganese bronze alloy was obtainable from numerous sources other than defendant. Thus, the decisive elements of the *Helene Curtis* case, *i. e.*, the intentional withholding by defendant, of superior knowledge which the contractor could not be expected to obtain from other sources, is conspicuously absent in the instant case.

### Waiver of Delivery Schedule

Plaintiff's second challenge is to the Board's conclusion that defendant's actions during contract performance did not amount to a waiver of the contract delivery schedule. It is plaintiff's contention that, contrary to the Board finding that defendant's conduct constituted mere forbearance, in fact defendant encouraged and induced the defaulting contractor to continue its efforts to produce a satisfactory product, and thereby incur further expense in pursuit of that goal. Specifically, plaintiff alludes to the following as establishing a course of dealing which was inconsistent with defendant's contractual right to terminate for default: Defendant's agreement (at the August 12 meeting) to examine and test any and all preproduction models submitted by plaintiff; defendant's acceptance and evaluation of the sample submitted in early September; and the "delay" between plaintiff's first default (July 27) and the contract's ultimate termination date (September 6).[15]

In the absence of any formal amendment, modification, or other expression of contractual waiver, there remains to be resolved the question whether a waiver of defendant's right to terminate for default can be reasonably implied from its conduct prior to final termination. With respect to the August 12 meeting, there was uncontradicted testimony that plain-

14. Snyder-Lynch Motors, Inc. v. United States, 292 F.2d 907, 154 Ct.Cl. 476 (1961) (Defendant did not disclose that the cost of certain parts, required by plaintiff in the contract would substantially exceed an estimate suggested to plaintiff by a Government contract negotiator); Bateson-Stolte, Inc. v. United States, 145 Ct.Cl. 387, 172 F.Supp. 454 (1959) (Defendant was under a duty to disclose if it knew that the Atomic Energy Commission was contemplating the construction of a huge construction project in the same general area which would necessitate the employment of a large labor force from high-wage rate urban areas, and thereby increase the prevailing wages in the area. The case was remanded to the Trial Commissioner and, subsequently, it was held that de-

fendant did not possess this information; Bateson-Stolte, Inc. v. United States, 305 F.2d 386, 158 Ct.Cl. 455 (1962)); Ragonese v. United States, 120 F.Supp. 768, 128 Ct.Cl. 156 (1954) (Defendant did not disclose information which would have warned plaintiff that it was apt to encounter large quantities of excess underground water in the construction area).

15. Plaintiff also cites defendant's frequent references to the urgency of the project as being inconsistent with its right to terminate for default. However, these frequent declarations did nothing more than remind plaintiff of a circumstance which was fully explained and repeated before and during the production phase of the procurement.

tiff's president initiated the request for defendant's aid in testing and evaluating production samples. Defendant expressly prefaced its consent with the reminder that plaintiff was already in default, and that defendant was not contractually obligated to conduct such tests. It was at this point that plaintiff could have requested a formal contract modification or at least some tangible confirmation that the parties had reached a positive meeting of the minds to the effect that time was no longer of the essence and, hence the delivery schedule was being waived. Such was not the case, however, and plaintiff's interpretation of the significance of the meeting and subsequent reliance thereon, unsupported by further testimony or other evidence, cannot by itself divest defendant of its contractual right to terminate for default. Thus we agree with the Board's categorization of defendant's conduct at the August 12 meeting as nothing more than a voluntary offer of courtesy assistance beyond express contractual obligations.[16] Consequently, we find that a waiver of the delivery schedule cannot be implied from defendant's actions at this mid-production meeting.

Plaintiff places greatest emphasis upon the time interval between initial default (July 27) and the date of final termination (September 6)—a period of 41 days. In support of its contentions that this time lapse must be deemed an unreasonable delay and inconsistent with the retained right of termination for default, plaintiff cites De Vito v. United States, 413 F.2d 1147, 188 Ct.Cl. 979 (1969). In De Vito, the Government was held, by this court, to have waived its rights to terminate for default by reason of a 48–day delay between default and termination.

■ We start with the proposition, succinctly stated in De Vito, that the circumstances of each individual case determine what is a reasonable time for the Government to terminate a contract after default. It is necessary, therefore, to scrutinize carefully, in each case, the time sequence which preceded termination, while paying special attention to any significant event or action by either party during the pertinent time interval which tends to mitigate, justify or explain a particular course of action or omission. Indeed, a comparison of De Vito and the instant case reveals important and distinguishing differences. In the earlier case, the court's holding was based, in large part, on the finding that the contracting officer's request for authorization to terminate for default "inexplicably languished" in the Office of the Chief Signal Officer in Washington for 35 days *without reasonable explanation or significant intervening event,* during which time " * * * plaintiff made every effort to compensate for its earlier misfortunes and to catch up on delivery requirements, both by augmenting its payroll, letting subcontracts expeditiously, purchasing additional tooling, and performing some of the machining itself." *De Vito, supra,* 413 F.2d, at 1153, 188 Ct.Cl., at 989.

In the instant case, defendant was informed, precisely one day before the first deliveries fell due that, as a result of a breakdown in communications between plaintiff and its subcontractors, ten additional days would be required to complete the patterns. Bearing in mind that defendant was in urgent need of the fruits of this procurement, and that reasonable flexibility within the terms of an existing contract is decidedly less complex and less time-consuming than the lengthy process of reprocurement, we cannot say that defendant delayed an unreasonably long period of time from July 27, the date of first default, until August 10, the date of defendant's letter requesting plaintiff to "show cause." Nor can we categorize the time period between the

---

16. During cross-examination before the Board, plaintiff's president conceded that nothing in the contract required the submission of samples, and that his discussion with defendant's engineers at Mc-Clellan, on August 12 and 13, was purely a voluntary act and a courtesy extended to the contractor by the Government. Transcript at 92.

August 10 letter and ultimate termination on September 6, *i. e.*, an additional 27 days, as unduly long and unreasonable under the circumstances. Once again, there occurred during this period significant intervening events which in our opinion, mitigated any prejudice plaintiff might have suffered from defendant's decision to effect termination no sooner than September 6. We refer, of course, to the strategy session held by the parties on August 12 and 13, at which time plaintiff commented favorably on its progress, and especially to the reassurances plaintiff incorporated into its August 19 answer to defendant's show-cause letter, from which we quote in part:

> * * * Altho [sic] the problems have been unusually severe, we have by dilligence [sic] and skill progressed to the point where we are now producing parts of the high quality required.
>
> * * * * * *
>
> We feel that by the time this letter is received we will be delivering parts and that the Government would only create a further delay in terminating the program at this point. Further we feel confident that we can deliver at a rate that will enable us to complete this program on schedule by the end of next month.

In sum, we find ample support in the record for the conclusion of the ASBCA that defendant's actions, quite obviously influenced by plaintiff's optimistic projections, did not amount to encouragement or inducement to the defaulting contractor to continue production efforts beyond default. In light of defendant's extensive experience in Government procuring and in the absence of convincing evidence, it cannot be presumed that defendant waived its right to terminate for default, even impliedly, in a situation where the procured item is urgently needed as part of a vital and high integrity national program, and the contractor has yet to demonstrate satisfactorily that it is capable of successfully producing the article. If we are to penalize defendant for displaying a benevolent attitude towards the defaulting contractor (a posture, incidentally, which the Government does not frequently assume), we must be prepared for the predictable and undesirable consequence of discouraging defendant from again rendering any assistance, voluntary or otherwise, beyond that specifically required by the contract, for fear of waiving an essential contractual right.

Finally, defendant's acceptance and evaluation of the sample hook submitted by plaintiff in early September, *with knowledge of the termination proceedings,* is not inconsistent with its right to terminate for default but, to the contrary, is entirely in accord with defendant's repeated efforts to aid plaintiff in manufacturing a finished and suitable recovery hook. There was testimony to the effect that plaintiff's acceptance of the original project was based on the reasonable expectation that further orders for similar hooks would be negotiated in the future, due to the fact that a large number of units were consumed or lost during training and mission operations. It is not unreasonable to assume, therefore, that defendant's actions, at least in part, were designed to enable plaintiff to productively participate in such future procurements.

### Misrepresentation of RFP

Plaintiff contends, as its third basis for recovery, that it was misled by the RFP and by certain circumstances surrounding it into believing that the project called for a "straightforward job of forming and polishing the prescribed metal." On the basis of a brief time in which to submit bid proposals, a short delivery schedule, the 100% small business set-aside, the absence of preproduction (first article) testing and a $10 unit price bid evaluation example, plaintiff claims that it submitted unreasonably low bids and accepted a contract with an unrealistic delivery schedule.

Considered individually, we cannot say that any one of these factors, standing alone, would be sufficient to mislead a prudent contractor. Indeed, there seems ample justification for each as part of the

bid package. For example, the short bid proposal and delivery time and the absence of first article testing are attributable to the urgency of the program, and defendant's belief, based on the fact that the hooks had been successfully cast previously, that plaintiff would encounter no unforeseeable difficulties during production. The bid evaluation example was priced at $10 as a completely arbitrary choice, and plaintiff's president testified before the Board that he could not blame his bid pricing on that example.[17]

Plaintiff argues that all these factors considered together and in context present a misleading image of the true nature and requirement of the procurement. We are convinced, however, that any slight misleading impression engendered by the RFP would have been more than offset by defendant's request for bid confirmation and defendant's preproduction warning, although expressed in general terms, that the manufacturing process plaintiff was about to undertake was going to be difficult. It is not critical whether plaintiff was specifically told how much lower was his bid than the next lowest bidder. A request for bid confirmation is intended to put a prudent contractor on notice that the Government questions at least some part of the bid proposal. Consequently, a thorough investigation of all aspects of the proposed procurement is appropriate and this would include all technical procedures. Moreover, when plaintiff was informed that the project would be difficult, it was presented with an ideal opportunity to inquire into all the complexities of the metallurgical casting process it was about to undertake. Instead, plaintiff ignored this warning and made no further requests for information or assistance. For these reasons, we find that the Board's conclusion that plaintiff was not misled into bidding for the contract is supported by substantial evidence.

*Dissimilarity of Reprocurement*

Plaintiff's final argument is that the imposition of excess reprocurement costs was improper for the reason that the hooks obtained under the Brandt reprocurement contract were dissimilar to those which were to be produced and delivered by plaintiff under the instant contract. The Board found, however, that the material, essential configuration and purpose of the reprocured articles were the same as those which plaintiff had agreed to furnish. Although this revision ultimately necessitated a rise in the unit price of the pole hook,[18] the testimony, upon which the Board relies, clearly supports the conclusion that the revision was dimensional and very slight. According to the testimony of defendant's "buyer" for the instant procurement, this minor change in pattern was made necessary by the redesign of another part of the aerial recovery system which joined the hook during the system's functional operation. If the hook was not modified slightly to take into account this latter revision, these two contiguous parts of the recovery system would have been rendered incompatible and useless.[19]

In any event, the Board's long years of experience in such technical matters places it in the best position to evaluate the relative importance of an admittedly slight dimensional change in a procured item, and where, as here, its findings are supported by substantial evidence, they will not be disturbed.

*Conclusion*

Although the issues in this case were clearly drawn, the administrative record, as it developed before the Board, often created more problems than it solved There was adduced at the hearing much contradictory evidence. In more than one instance, the expert witness presented by one party gave as much if not more testi-

---

17. Transcript at 46.

18. We note that plaintiff was not charged with the added costs resulting from this amendment.

19. Transcript at 312.

monial support to the opposing side as to its own. Although plaintiff was able to formulate and advance reasonable arguments on all issues, its presentation lacked the necessary corroborative testimony, documentation, or other evidence to support its bare allegations. Thus, it failed to meet its burden of establishing in what respects the administrative record did not support the findings of the Board. Sundstrand Turbo v. United States, 389 F.2d 406, 422–423, 182 Ct.Cl. 31, 60 (1968); Jefferson Construction Co. of Fla. v. United States, 364 F.2d 420, 424, 176 Ct.Cl. 1363, 1369 (1966).

The prime duty of this court, in a case where relief from the decisions of the ASBCA is sought exclusively under the terms of the Wunderlich Act, is clear. Absent an allegation that the Board decision was fraudulent, the only issue before the court is whether the decision of the ASCBA was arbitrary, capricious, so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. We have stated previously in River Construction Corp. v. United States, 159 Ct.Cl. 254, 261 (1962):

> \* \* \* This issue is very different from the question of whether the Appeals Board decision was correct. This court may well disagree with the Appeals Board decision but unless the plaintiff has shown the defects described by the Wunderlich Act, there can be no recovery here. T. C. Bateson Construction Co. v. United States, 149 Ct.Cl. 514, 518. Even though there may have been evidence before the Appeals Board upon which it could have based a decision in favor of the plaintiff, the decision which the board made may still be found to have been supported by substantial evidence, when the whole record is considered. \* \* \*

Our review of the administrative record has left no doubt that there was substantial evidence before the ASBCA as might convince a reasonable man to support the conclusions reached by that tribunal. Dittmore-Freimuth Corp. v. United States, 390 F.2d 664, 683, 182 Ct. Cl. 507, 537 (1968); Midwest Spray &

Coating Co. v. United States, 176 Ct.Cl. 1331, 1333 (1966). Therefore, we hold the Board decision to be final and conclusive.

Accordingly, plaintiff's motion for summary judgment is denied. Defendant's cross-motion for summary judgment is granted, and the petition is dismissed.