GAF CORPORATION,
Plaintiff–Appellant,

v.

The UNITED STATES,
Defendant–Appellee.

No. 90–5079.

United States Court of Appeals,
Federal Circuit.

May 8, 1991.

Rehearing Denied June 11, 1991.

Suggestion for Rehearing In Banc
Declined July 30, 1991.

Sidney S. Rosdeitcher, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, argued, for plaintiff-appellant. With him on the brief, were David G. Bookbinder, Theodore F. Haas and Robert N. Kravitz.

David S. Fishback, Asst. Director, Torts Branch, Civ. Div., Dept. of Justice, Washington, D.C., argued, for defendant-appellee. With him on the brief, were Stuart M. Gerson, Asst. Atty. Gen., J. Patrick Glynn, Director, Eric D. Goulian and Christina M. Humway, Trial Attys.

Before RICH, NEWMAN, and RADER, Circuit Judges.

RADER, Circuit Judge.

In 1944, GAF Corporation's (GAF) predecessor, the Ruberoid Company (Ruberoid), entered contracts with the United States Navy (Navy) to insulate ships with asbestos products. Ruberoid's shipyard workers contracted asbestosis. GAF incurred substantial liability for injuries and death due to these workers' exposure to asbestos.

GAF sued in the United States Claims Court seeking indemnification from the Government for its liabilities. GAF contended that the Navy knew in the 1940s of the health risks of asbestos and deliberately withheld that information from Ruberoid. The Claims Court granted summary judgment dismissing GAF's claims. *GAF Corp. v. United States*, 19 Cl.Ct. 490 (1990) (*GAF Corp.*). The Claims Court determined that the Navy had no contractual duty to warn an asbestos producer of hazards in its product. GAF appealed. This court affirms.

## Background

In 1930, Ruberoid acquired controlling interest in Eternit, a firm which manufactured asbestos building materials. At the time of the acquisition, Eternit's employees had sued the company for injuries caused by exposure to a variety of dusts, including asbestos dust. Ruberoid settled several of these suits. Due to these suits, Ruberoid took steps to protect its workplaces against occupational hazards. From 1930 until the mid–1960s, Ruberoid experienced only two similar worker claims. In 1967, GAF acquired Ruberoid by merger.

In the early 1940s, Ruberoid developed a product called Calsilite to insulate Navy ships. Calsilite contained asbestos. Beginning in 1944 and stretching over two more decades, the Navy bought Calsilite from Ruberoid. Over this period, shipyard workers installed, repaired, and replaced Ruberoid's Calsilite.

From June to August 1947, Ruberoid purchased raw asbestos fiber from the Reconstruction Finance Corporation, a Government entity. The purchase contracts contained no express warranties nor disclaimers of warranties. In 1951, the Defense Minerals Exploration Administration (DMEA) subsidized Ruberoid's exploration for raw asbestos fiber. The exploration subsidy contract contained no warranties about the safety of asbestos products.

Due to prolonged contact with the asbestos, many shipyard workers contracted deadly diseases. These workers filed wrongful death and personal injury tort claims against GAF. GAF incurred substantial costs in judgments, settlements, and legal fees.

In 1983, GAF filed a Tucker Act claim (28 U.S.C. § 1491 (1982)) against the United States in the Claims Court. At the same time, several other asbestos producers filed suits. The Claims Court tried another company's action ahead of GAF's claim. *Johns–Manville v. United States*, 13 Cl.Ct. 72 (1987). This court vacated that judgment on jurisdictional grounds. *Johns–Manville v. United States*, 855 F.2d 1571 (Fed.Cir.1988). On the same day, this court affirmed a district court's dismissal of a similar Little Tucker Act claim (28 U.S.C. § 1346(a)(2) (1982)). *Lopez v. A.C. & S. Inc.*, 858 F.2d 712 (Fed.Cir.1988), *cert. denied sub. nom. Eagle–Picher Ind., Inc. v. United States*, 491 U.S. 904, 109 S.Ct. 3185, 105 L.Ed.2d 694 (1989).

Arguing that GAF's complaint raised the same questions resolved by this court in *Lopez*, the Government moved for summary judgment. The Claims Court granted the Government's motion and dismissed GAF's complaint. The Claims Court presents a complete recitation of the facts of this case. *GAF Corp.*, 19 Cl.Ct. at 494–96.

## Discussion

GAF contends that the Claims Court committed three reversible errors. First, GAF faults the Claims Court for denying a trial on whether the Government breached a duty to disclose "superior knowledge" of asbestos hazards. GAF also criticizes the Claims Court for denying a trial on whether the Government breached an implied warranty of specifications for Calsilite insulation. Finally, GAF contends that the Claims Court wrongly dismissed for lack of jurisdiction its claim that the Government breached an implied warranty on the raw asbestos sold by the Government to Ruberoid.

### Superior Knowledge

This court has set forth principles governing claims that the Government knew of asbestos hazards but withheld that knowledge from an unwary asbestos producer. *Lopez*, 858 F.2d at 717.[1] This "superior knowledge" doctrine can, in limited circumstances, supply the basis for a breach of contract. To show a breach under the superior knowledge doctrine, a contractor claiming a breach by non-disclosure must produce specific evidence that it

> (1) undert[ook] to perform without vital knowledge of a fact that affects performance costs or direction, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

*Lopez*, 858 F.2d at 717 (citing *American Ship Bldg. Co. v. United States*, 228 Ct.Cl. 220, 654 F.2d 75 (1981)).

In a prior asbestos case, a five-judge panel of this court assumed "the government did know things it did not reveal, and that it used a defective product in ways that added to the hazard, but were not known to suppliers." *Lopez*, 858 F.2d at 717. Nonetheless in *Lopez* this court discerned no reason the trial court should have applied the superior knowledge doc-

trine. This court determined that the asbestos producers could not satisfy the second element of the superior knowledge doctrine. The Government had no reason to believe experienced asbestos producers lacked knowledge of the product's risks.

This court in *Lopez* reasoned that the superior knowledge doctrine does not impose on a customer the duty to inform an experienced producer that its products are hazardous. *Lopez*, 858 F.2d at 717–18. In *Lopez* the court noted that the "caselaw dealing with a government breach of a contract by non-disclosure of superior knowledge cannot be made to support the claims here in suit without so drastic a restructuring that we would be engaging in judicial legislation." *Lopez*, 858 F.2d at 718. GAF, like the asbestos producers in *Lopez*, in effect asserted "not only a duty of the customer to inform the supplier that his product is defective, but a duty to find out what he [the supplier] does not already know." *Id.* This additional duty does not "fit" the superior knowledge doctrine. *Id.* at 717–18. Indeed the doctrine does not impose on a buyer an affirmative duty to inquire into the knowledge of an experienced seller.

The Claims Court found that the Government had no reason to believe that Ruberoid lacked knowledge about asbestos hazards. *GAF Corp.*, 19 Cl.Ct. at 497. Ruberoid was an experienced asbestos supplier. Moreover, Ruberoid supplied its asbestos products to commercial as well as Government customers. Under those circumstances, the Government had no reason to believe that Ruberoid needed to learn more about asbestos hazards from its customer. GAF stumbles on the same hurdles in the superior knowledge doctrine that the producers in *Lopez* could not surmount. Construing factual inferences in GAF's favor, the Claims Court correctly determined that GAF's showings did not create a triable issue. *GAF Corp.*, 19 Cl.Ct. at 497, 498–99 n. 2.

### Implied Warranty of Specifications

This court has also set forth principles governing implied warranties of speci-

---

**1.** GAF participated in *Lopez v. A.C. & S. Inc.*, 858 F.2d 712 (Fed.Cir.1988) as an *amicus curiae*.

fications under the Tucker Act. This court acknowledged that an implied warranty requires "circumstances strongly support[ing] a factual inference that a warranty was implied." *Lopez*, 858 F.2d at 715. This inference may arise only when the Government's specifications tell a contractor "just how to do the job." *Id.* at 716. An implied-in-fact warranty does not arise when the Government merely "specified any characteristic at all in the merchandise it purchased." *Id.* at 715. In *Lopez*, this court did not detect any signs of extensive Government intrusion into the asbestos production process which might suggest that the Government intended to warrant the product's safety. This court stated, "[i]t would be just as reasonable for the parties to the sale to have implied a warranty by the seller, that apart from dangers the seller warned of, the insulation would not endanger the buyer or its employees. Either way it would be a warranty implied in law, not fact." *Lopez*, 858 F.2d at 716.

▇ Under Claims Court summary judgment rules, the Government provisionally conceded that Ruberoid's contracts contained design specifications. According to GAF, the Government's use of design specifications would suggest sufficient Government control to support an implied warranty.

The Claims Court, however, found that GAF showed no differences between specifications on Ruberoid's commercial products and specifications on its products sold to the Government. In *Lopez*, this court noted the significance of that showing to an inference of an implied warranty. *Id.* at 715–16.

The Claims Court found that GAF did not show that Ruberoid's Government products differed in any material respect from its commercial products. *GAF Corp.*, 19 Cl.Ct. at 497. The Government contract specifications requested the type of asbestos products Ruberoid supplied to the public in general. Under those circumstances, the Government had no reason to suppose it needed to provide Ruberoid with a warranty on Ruberoid's own commercial prod-

ucts. The factual circumstances at the time of contracting do not support an inference that the Government intended—though not in writing—to indemnify Ruberoid for any injuries from Ruberoid's own products.

GAF relies on three cases to suggest buyers may extend implied warranties to sellers. *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); *Ordnance Research, Inc. v. United States*, 221 Ct.Cl. 641, 609 F.2d 462 (1979); and *Blount Bros. Corp. v. United States*, 872 F.2d 1003 (Fed.Cir.1989). In *Lopez*, this court distinguished a "mere supply contract," like Ruberoid's, from a "construction contract with its massive detail all prescribed by the owner," like Spearin's. *Lopez*, 858 F.2d at 715.

These cases, however, bolster the Claims Court's holding that the parties implied no warranty of specifications. In each of these three cases, the contractor could do nothing short of violating the specifications to avoid its losses. The specifications themselves caused the losses. Those unique specifications and circumstances warranted the inference that the Government in fact intended to provide a warranty. Ruberoid, on the other hand, incurred liability for failure to place warnings on its products. *GAF Corp.*, 19 Cl.Ct. at 503. Nothing in the contract specifications prevented Ruberoid from putting warnings on its products. These asbestos supply contract specifications, whether design or performance, did not cause Ruberoid's tort losses. Thus, this case differs from *Spearin*, *Ordnance*, and *Blount Bros.*

Thus, the specifications in Ruberoid's contract, whether design or not, do not alter the reasoning of *Lopez*. GAF did not distinguish Ruberoid's commercial from its Government products. The case law invoked by GAF does not support an implied warranty in this case. As noted by the Claims Court, the circumstances of Ruberoid's transactions with the Government do not create a triable issue on the implied warranty question. *GAF Corp.*, 19 Cl.Ct. at 497.

### Warranty of Merchantability and Fitness

■ The Government sold Ruberoid raw asbestos fiber from Government stockpiles in 1947. These sales were simple transactions containing no express warranties. GAF faults the Claims Court for refusing to incorporate into these contracts the Uniform Commercial Code's warranties of merchantability and fitness.

■ Congress has not applied the Uniform Commercial Code to federal contracts. Hawkland, *UCC Series* § 1–101:01, pp. 3–4. The Claims Court may not do by judicial fiat what Congress has not done by legislation. The trial court may not enforce a warranty implied-in-law. The Tucker Act does not grant the Claims Court jurisdiction to enforce contracts implied-in-law. *Hatzlachh Supply Co. v. United States,* 444 U.S. 460, 465 & n. 5, 100 S.Ct. 647, 650 & n. 5, 62 L.Ed.2d 614 (1980); *Lopez,* 858 F.2d at 714–15. The Claims Court correctly dismissed this claim.

### Conclusion

Based on *Lopez,* the Claims Court dismissed GAF's case. GAF did not show that the Claims Court committed any reversible error. Therefore, the judgment of the Claims Court is

AFFIRMED.

PAULINE NEWMAN, Circuit Judge, dissenting.

But for an asserted material factual distinction from the premises of our decision in *Lopez v. A.C. & S. Inc.,* 858 F.2d 712 (Fed.Cir.1988), *cert. denied,* 491 U.S. 904, 109 S.Ct. 3185, 105 L.Ed.2d 694 (1989), I share the view that the *Lopez* decision bars relief for GAF under the Tucker Act. However, on motion for summary judgment the nonmovant's assertions of fact must be taken as true if adequately supported, and summary disposition is improper unless, despite the nonmovant's view of the facts, judgment must be rendered against it as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Unlike the factual record developed in *Lopez,* GAF has proffered evidence that shows, on its face, that at the time the government contracted with Ruberoid the Navy actively suppressed knowledge that was significantly superior to that available from any other source, and instead allowed misleading information to be published. In addition, GAF has proffered affidavit evidence positively averring Ruberoid's lack of knowledge as to hazardous conditions created by the Navy's misuse of asbestos products, and other evidence giving rise to inferences that Ruberoid could and would have taken steps to protect itself from this added risk. The court in *Lopez* did not establish a general rule that encompasses these facts. GAF thus was entitled to establish the actual factual situation, for in *Lopez* the court did not hold that there was no version of the issue of superior knowledge that could support any of GAF's contract theories. Thus I believe that summary judgment in favor of the United States was improvidently granted.

### A

GAF supported its argument with previously classified government documents. For example, there is a memorandum dated March 11, 1941 from Commander C.S. Stephenson, Chief of the United States Navy Division of Preventive Medicine, to Admiral McIntire:

> None of our foundries would pass the necessary inspection to obtain workman's compensation insurance from any of the insurance organizations. I doubt if any of our foundries would be tolerated if the State industrial health people were to make surveys of them. Repeated recommendations have been made by the medical officers attached to these yards that studies be made on dust concentrations and steps be taken to remedy this condition.

Commander Stephenson expressed concern about the Navy's "protecting the men as we should":

> Asbestosis. We are having a considerable amount of work done in asbestos and from my observations I am certain that

we are not protecting the men as we should. This is a matter of official report from several of our Navy Yards.

In a March 4, 1941 memorandum Commander Stephenson referred to "possible labor unrest" if inspectors were allowed to observe the conditions in the Navy Yards. GAF also cites a report on the Bath (Maine) Iron Works in 1942, that describes the cutting and pounding of asbestos insulation to fit pipes in Navy ships:

> The conditions in this shop present a very real asbestos hazard and immediate steps should be taken to segregate the most dusty processes into a well ventilated area.

A 1944 classified report on the Bath Iron Works stated that 12 out of 38 workers that were X-rayed showed significant signs of exposure to dust, and four were diagnosed as having asbestosis.

A 1943 report on the shipbuilding facilities at Seattle, Washington stated:

> Most of the dust that escapes from the cutting operations finds its way eventually to the rafters overhead where it is thickly settled. Frequent removal of this dust is not practiced.

A 1944 report described conditions at the Defoe Shipbuilding facility at Bay City, Michigan:

> Amosite contains a considerable percentage of asbestos and studies have shown that dust from it, if breathed in sufficient quantity for a prolonged period, are capable of causing the disabling occupational disease, asbestosis, which is similar in its effects to silicosis.

These papers and others were classified under the Espionage Act, making it a criminal offense to reveal their content.

While the *Lopez* court had some of these classified documents before it, GAF's evidence goes much further in support of its position that the government's knowledge of the hazards and consequences of exposure to asbestos, and of the conditions in which it was used by the Navy, was superior to that known to manufacturers of asbestos. Affidavits of record state that although the manufacturers were aware of health hazards due to exposure during manufacture of asbestos products, it was not generally known until the 1960s that the general use of these products posed a similar hazard. Indeed, in distinction from the government's classified reports, GAF points to the "Fleischer–Drinker Report", released by permission of the Navy in 1946, that downplayed the hazards of asbestos use in the Navy:

> The character of asbestos pipe covering industry on board naval vessels is such that conclusions drawn from other asbestos industries such as textiles, cannot be applied.

The report stated:

> The incidence of asbestosis among pipe coverers in the shipyards studied was low.... In view of the nature of shipyard pipe covering work, this low incidence is not surprising.

The apparent conflict between this publication and the Navy's internal documents raises factual questions which, if found in accordance with GAF's position, support GAF's argument that the hazardous nature of the Navy's usage of asbestos products was not generally known, that the Navy's knowledge was superior, and that it was withheld at the time the contract with Ruberoid was entered into and performed. This additional supporting evidence was not presented in *Lopez* by any party, or by GAF in its brief *amicus curiae*.

In *Lopez* the court assumed that the government knew things it did not disclose, and that it used the asbestos in a way that added to the hazard, but concluded that "[t]he government might reasonably suppose Raymark and Eagle–Picher knew enough about asbestos and its perils not to need to learn more about it from the government." 858 F.2d at 717. However, *Lopez* was decided on the basis of the allegations in the complaints of Raymark and Eagle–Picher, which were directed primarily to implied warranty theories under the Tucker Act and breach of duty theories under the Federal Tort Claims Act. The government's supplemental brief in *Lopez* states that an alleged breach of duty to disclose superior knowledge "was not asserted in the complaint before the district

court below." *Lopez*, Govt.Supp.Brf. at 14 n. 11. The superior knowledge theory now pressed by GAF was not before the *Lopez* court, and the matter of relative knowledge of the hazards of asbestos was treated in a different context. In *Lopez* the court referred to the superior knowledge question in the classical terms of cost of production, as well as noting the need for specific evidence to support this theory of liability:

> Since the government is entitled to presume that one who bids on a government invitation knows his own capabilities and ascertained he will be able to produce, and at what cost, it would be up to the contractor, complaining of a breach by non-disclosure, to produce specific information to back up his contention.

*Lopez*, 858 F.2d at 717. Raymark and Eagle–Picher had not met this burden. The court also presumed a factual situation that was not, apparently, refuted in *Lopez*:

> We must presume that government officials acted in good faith, the contrary not being alleged. Acting in good faith, they could not have knowingly exposed their own employees to undue asbestos hazards.

*Id.* at 717–18.

In this case, GAF has proffered factual support not provided in *Lopez*, pointing out that the government monitored the health hazards, knew of the significant health risk to which it knowingly exposed its employees, classified the results as a military secret, and released misleading public information in its stead. For purposes of summary judgment we must accept these allegations as true. The evidence adduced by GAF provides sufficient factual support for its position that the discrepancy in knowledge was significantly different from that before the court in *Lopez*, such that there was created a material issue of fact as to whether the government's knowledge was indeed different from that previously known to Ruberoid, and whether the government had an obligation to disclose its knowledge to its contractor, when its silence subjected the contractor to increased liability risk.

**B**

The government argues that any withholding of knowledge by the Navy did not increase Ruberoid's cost of performance of the contract, and that any later cost to Ruberoid based on tort liability to employees of the Navy can not be subject to full or even partial indemnification by the government, on any theory based on the contractual relation between the Navy and Ruberoid.

GAF states, correctly, that this was not the holding of *Lopez*. The court in *Lopez* did not purport to decide, on the facts there at bar, a universal principle of Tucker Act law. Nor can I today define the precise line beyond which there would always be an obligation of the government to disclose information that it knows, or is charged with knowing, would reasonably affect the terms of the supply contract. On the facts alleged by GAF, such an obligation is not barred by operation of law. In simpler situations, the withholding of superior knowledge by the government, such that a contractor's costs of performance are increased, has been recognized as compensable under the Tucker Act. *E.g. Petrochem Services, Inc. v. United States*, 837 F.2d 1076, 1079 (Fed.Cir.1988); *American Ship Bldg. Co. v. United States*, 228 Ct.Cl. 220, 654 F.2d 75, 79 (1981). Liability is not defeated by the fact that the contractor had knowledge or experience pertaining to the subject matter of the contract. In *J.A. Jones Construction Co. v. United States*, 182 Ct.Cl. 615, 390 F.2d 886, 890, 893 (1968) the government was held liable for the contractor's increased cost of performance because the government had classified certain information that affected the contractor's labor costs. In *Helene Curtis Industries, Inc. v. United States*, 160 Ct.Cl. 437, 312 F.2d 774, 777–79 (1963) the government had conducted research and obtained information that it did not disclose, on the need to grind the product; the Court of Claims held that the plaintiff was entitled to recover its increased costs of performance, stating:

> Although it is not a fiduciary toward its contractors, the Government—where the

balance of knowledge is so clearly on its side—can no more betray a contractor into a ruinous course of action by silence than by the written or spoken word.

*Id.* 312 F.2d at 778. In *Hardeman–Monier–Hutcherson v. United States*, 198 Ct.Cl. 472, 458 F.2d 1364 (1972), the Navy had suppressed reports documenting its knowledge about adverse weather conditions, resulting in material delays in the performance of a contract, for which the government was held liable. *Id.* 458 F.2d at 1371–72. While these courts did not reach issues of consequential damages, neither are such damages excluded, as a matter of law, from consideration when there is a duty to disclose information known only to the government. Nor is recovery of litigation and settlement costs excluded, as a matter of law, where the breach of duty led to the litigation. See the Restatement (Second) of Contracts § 351 comment c (1981) ("The party in breach is liable for the amount of any judgment against the injured party together with his reasonable expenditures in the litigation, if the party in breach had reason to foresee such expenditures as the probable result of his breach at the time he made the contract.") In *Travelers Insurance Co. v. United States*, 493 F.2d 881 (3d Cir.1974) the Third Circuit remanded for consideration of whether the government was required to indemnify the manufacturer of a seventy-seven foot tower for a $125,000 judgment awarded a government employee who fell from the tower, where the manufacturer had alleged that the government's specifications for the tower were defective and caused or contributed to the injury. The court stated:

Evidence consistent with these allegations might show contractual responsibility of the defendant so that there would be a basis for recovery under an implied contractual right to indemnification.

*Id.* at 888.

When the factual record is viewed favorably to GAF, as it must be, the magnitude of the government's superior knowledge and the extent of its deliberate concealment raise a fresh issue, not considered in *Lopez*. If the facts are found to support an obligation to disclose the increased liability to which the Navy was exposing the manufacturer during performance of the contract, then the inferences on which the *Lopez* decision was based do not apply. Thus the extent of the government's knowledge, and the effect of the government's concealment, are material factual issues.

The asserted facts distinguish markedly from those cases wherein no obligation to disclose has been placed on the government. *See, e.g., T.F. Scholes, Inc. v. United States*, 174 Ct.Cl. 1215, 357 F.2d 963, 970 (1966) (no recovery where information withheld was merely analysis by government derived from data made available to contractors); *H.N. Bailey & Associates v. United States*, 196 Ct.Cl. 166, 449 F.2d 376, 382 (1971) (no recovery where relevant information was available through published textbooks and other scholarly works).

In this case, the Navy classified as a military secret its knowledge of asbestos hazards under the Navy's conditions of use. Whether the government had an obligation to disclose this knowledge to an experienced producer of asbestos can not be answered as a matter of law. The obligation to disclose is partly dependent on what the knowledge is, and what would reasonably be expected of such a party, entering into a contract with another. *See, e.g., Milmark Services, Inc. v. United States*, 731 F.2d 855, 859 (Fed.Cir.1984) ("the Government's duty [to disclose] must be considered in light of the circumstances"). The obligation of a party to a contract to disclose information that may affect the contract terms or its performance is reflected in various theories of contract law. GAF is entitled to the opportunity to develop facts that could support its theory that the government had an obligation to disclose certain knowledge to its contractor, and that the failure to do so incurred potential liability for breach. Thus, respectfully, I dissent from the summary disposition of this claim.