**GAF CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 287–83C.

United States Claims Court.

Feb. 12, 1990.

Paul A. Zevnik, Washington, D.C., for plaintiff. Sidney S. Rosdeitcher, David G. Bookbinder, William N. Gerson, Theodore F. Haas, and Robert N. Kravitz, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, and Kaye, Scholer, Fierman, Hays & Handler, Washington D.C., of counsel.

David S. Fishback, Washington, D.C., with whom were S. Michael Scadron, James C. Brennon, and Asst. Atty. Gen. Stuart M. Gerson, for defendant. J. Patrick Glynn, Director, Torts Branch, and Harold J. Engel, Deputy Director, of counsel.

## OPINION

NETTESHEIM, Judge.

This case is before the court on defendant's motion to dismiss or for summary judgment. Plaintiff has opposed and argument has been held.

## BACKGROUND

Plaintiff GAF Corporation ("plaintiff"), a manufacturer of asbestos products, sued the United States on May 5, 1983, for im-

plied contractual indemnification for damages sustained as a result of actions by or on behalf of shipyard workers to recover for injuries or death due to exposure to asbestos. The case proceeded in tandem with similar cases, ultimately eleven in all, filed by other asbestos manufacturers. By mid-1986 it had been decided that the cases would be tried serially. Plaintiff's was second in line. The first, a six-week trial, was scheduled to begin on March 16, 1987. On July 16, 1986, all the then-pending cases were reassigned to this judge.

Before the first trial began, this court certified to the Federal Circuit for expedited ruling an order dismissing three of the cases, including the case scheduled for trial, for lack of subject matter jurisdiction. *Keene Corp. v. United States*, 12 Cl.Ct. 197 (1987). The Federal Circuit did not act on the certification, although it was accepted. On the second day of trial, the appeals court deferred consideration of the order dismissing the case on jurisdictional grounds until the trial was completed. Following the merits decision in *Johns–Manville Corp. v. United States*, 13 Cl.Ct. 72 (1987), this court entered an order on November 4, 1987, staying all the remaining cases pending resolution of the post-trial appeals. The Federal Circuit affirmed the *Keene* order of dismissal for lack of jurisdiction in a decision styled *Johns–Manville Corp. v. United States*, 855 F.2d 1556 (Fed. Cir.1988) (per curiam). The Federal Circuit simultaneously vacated the trial court's merits decision since jurisdiction had been found wanting. *Johns–Manville Corp. v. United States, vacated on jurisdictional grounds*, 855 F.2d 1571 (Fed.Cir.1988) (per curiam).[1] The remaining cases were stayed pending resolution of the petition for writ of *certiorari* concerning the Federal Court's jurisdictional ruling. *Certiorari* was denied on March 6, 1989, —— U.S. ——, 109 S.Ct. 1342, 103 L.Ed.2d 811 (1989).

This court then proceeded to consider whether the Federal Circuit's jurisdictional ruling applied to the remaining cases. In

its opinion in *Keene Corp. v. United States*, 17 Cl.Ct. 146 (1989), *appeals docketed*, Nos. 89–1638, 89–1639 & 89–1648 (Fed.Cir. Aug. 2, 8, 1989), this court dismissed seven of the eight remaining asbestos cases for lack of subject matter jurisdiction. The eighth case, plaintiff's, was not dismissed in *Keene*. On September 15, 1989, defendant filed a motion to dismiss or, alternatively, for summary judgment contending that the claims in plaintiff's complaint were made in other cases and have been addressed and dismissed by other courts. The motion has been briefed pursuant to RUSCC 56 and seeks summary judgment, since the parties have presented—and the court has considered—extra-pleading materials in ruling on defendant's motion. *See* RUSCC 12(b).

After the Federal Circuit's jurisdictional ruling and before defendant filed the instant motion, the Federal Circuit issued binding precedent in *Lopez v. A.C. & S., Inc.*, 858 F.2d 712 (Fed.Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 3185, 3186, 105 L.Ed.2d 694 (1989), which affirmed dismissal of similar complaints, *inter alia*, for failure to state a cause of action. The Federal Circuit's decision was unanimous among a special five-judge panel convened to rule on that test case. *See* 858 F.2d at 713. Although the standards governing summary judgment apply, it is useful to examine the four claims themselves in plaintiff's complaint and juxtapose them with similar claims that the Federal Circuit has addressed and found to be legally insufficient.

1. Plaintiff's first claim is for breach of an implied contractual warranty, arising from the Government's promulgation and enforcement of contract specifications for asbestos products, that the specifications written by the Government were for products that would be safe and could be used safely. The alleged breach occurred because asbestos products manufactured pursuant to those specifications resulted in

---

1. Both plaintiff and defendant cite for substantive propositions the trial court's merits decision in *Johns–Manville Corp.* Reference is made to that opinion to the extent the parties have viewed it as instructive.

injuries to individuals exposed to those products.

The first claim made by Eagle–Picher Industries, Inc. ("Eagle–Picher"), another manufacturer of asbestos products, in its third-party indemnification complaint in 18 suits seeking damages for injuries to shipyard workers arising from exposure to asbestos (*decided sub nom. Lopez v. Johns Manville,* 649 F.Supp. 149 (W.D.Wash. 1986), *aff'd sub nom. Lopez v. A.C. & S., Inc.,* 858 F.2d 712 (Fed.Cir.1988)), is essentially identical to plaintiff's first claim, adding only the allegation that Eagle–Picher's products conformed to government-promulgated specifications. Raymark Industries, Inc. ("Raymark"), also a defendant in the *Lopez* cases, filed a third-party indemnification complaint claiming, *inter alia,* that the Government breached its implied warranty that asbestos products conforming to government specifications would be safe and could be used safely.

In affirming the district court's dismissal of *Lopez,* the Federal Circuit surveyed cases in which a warranty of specifications had been found and concluded that one can be implied in a supply contract only when the Government's design specifications tell the supplier "just how to do the job." 858 F.2d at 716. In respect of manufacturing asbestos products, the Federal Circuit declined to imply a warranty only upon evidence that "the government specified any characteristic at all in the merchandise it purchased...." 858 F.2d at 715. Rather, the manufacturers would have to show "whether the government specifications differed at all from those of private customers of Raymark and Eagle–Picher, or if they did, whether the difference related to the asbestos content of the material supplied." 858 F.2d at 715–16. Since Eagle–Picher did not make a sufficient showing that the Government's specifications were design, or "how the government could have supposed it needed to tell Raymark and Eagle–Picher how to make asbestos insulation, or how they needed to rely on such instructions," 858 F.2d at 716, any implied warranty running from buyer to manufacturer to indemnify for increased costs associated with the production of asbestos prod-

ucts would be implied in law and, therefore, not within the Claims Court's Tucker Act jurisdiction. *Id.*

Thus, to avoid the holding of *Lopez,* plaintiff in the case at bar must make a showing, sufficient to overcome defendant's summary judgment motion, that the Government had so far intruded itself into the manufacturing process that the specifications under which plaintiff manufactured its asbestos products could support an implied-in-fact warranty. Plaintiff must also make a showing that the asbestos products that it sold to the Government differed from its commercial products—such that the manufacture of plaintiff's commercial products did not put plaintiff on notice of the hazard inherent in the products sold to the Government.

2. Because the Government promulgated mandatory specifications for, encouraged development of, purchased, and had control of the conditions under which plaintiff's asbestos-containing products were used, plaintiff claims that the Government impliedly warranted that the specification and use of those products would not expose plaintiff to liability for damages. Plaintiff's second claim alleges that this warranty was breached due to the Government's failure to provide for safety of its shipyard workers or those of its contractors, failure to provide warnings of danger of asbestos exposure to shipyard workers and to plaintiff, failure to promulgate and enforce safety regulations, and failure to inform plaintiff of the intended use or misuse of their products.

The second claims of both Raymark's and Eagle–Picher's third-party suits in *Lopez* are identical in all essentials to plaintiff's reverse warranty claim. The Federal Circuit integrated its discussion of the reverse warranty and the warranty of specifications as two aspects of the same warranty: "that in specifying asbestos, the government made an implied warranty to sellers that its own use of the products would not expose the sellers to unforeseen defective product liabilities to persons who might be injured...." by them. 858 F.2d at 714. The existence of an implied reverse

warranty therefore was rejected by the court on the same basis: To be enforceable, the warranty would have to be implied in fact; third-party plaintiffs had not adduced facts to support such an implication; moreover, the warranty alleged is outside the bounds of the existing case law. *Id.* at 716.

Pursuant to an order of this court entered on June 16, 1989, plaintiff by letter to the Deputy Director of the Justice Department's Torts Branch informed defendant that plaintiff did not intend to pursue the reverse warranty aspects of this second claim. However, aspects relating to the conditions under which plaintiff-manufactured asbestos products were used after purchase and to the Government's knowledge of those conditions were retained, since it is alleged that they "are relevant to and support GAF's First, Third and Fourth Claims for Relief." Letter of July 14, 1989, from Sidney S. Rosdeitcher to Harold J. Engel, at 1–2.

3. Plaintiff's third claim alleges that because the Government sold raw asbestos to plaintiff without warning of health risks, the Government impliedly warranted that the asbestos was safe, merchantable, and fit for its intended purpose. This warranty allegedly was breached when the Government failed to reveal its superior knowledge of the health risks entailed in exposure to asbestos.

Various asbestos product manufacturers brought two third-party actions for indemnification against the United States in the District of Maine, one covering injuries growing out of exposures at private shipyards (Model Third–Party Complaint A) and the other out of exposures at Naval shipyards (Model Third–Party Complaint B). These suits, styled *In re All Maine Asbestos Litigation,* sought recovery of amounts the manufacturers had been required to pay to shipyard employees allegedly injured by asbestos exposure. The third-party complaints contain a claim that if it is established that the asbestos sold by the Government to third-party plaintiffs was not safe, then the Government breached its implied seller's warranty that the asbestos would be safe and fit for its purpose. (All Maine Model Third–Party Complaint "A" ¶ 25; Model Third–Party Complaint "B" ¶ 15.)

The late Judge Edward T. Gignoux of Maine ruled that this allegation did not state a claim over which Tucker Act jurisdiction could be exercised since, as there was no proof of an express undertaking that the asbestos sold by the Government was safe, any implied warranty of safety would be one implied in law. *In re All Maine Asbestos Litigation,* 581 F.Supp. 963, 972–73 (D.Me.1984), *aff'd,* 854 F.2d 1328 (Fed.Cir.1988) (Table). To make the requisite showing in the case at bar under the rationale of *All Maine Asbestos Litigation,* plaintiff would need to offer some evidence establishing that in its dealings with plaintiff the Government had manifested an intent to warrant the safety of the asbestos it sold. The Federal Circuit's affirmance in *All Maine Asbestos Litigation* was unpublished, and, pursuant to Fed.Cir.R. 47.8(c), it is not binding precedent on the Claims Court, except in respect of *res judicata,* collateral estoppel, or law of the case. However, Judge Gignoux's opinion, although not itself binding, is persuasive authority of another federal trial court considering the identical claim and is a decision to be reckoned with.

4. Plaintiff's fourth claim is based on the theory of implied contractual duty to reveal superior knowledge. Plaintiff contends that because the Government assisted it in developing asbestos products, promulgated specifications requiring the use of asbestos, and had actual knowledge of the health risks of exposure to asbestos, the Government acquired a contractual duty to reveal its superior knowledge of those risks which it breached by withholding that knowledge.

Neither the third-party complaints in *All Maine Asbestos Litigation* nor in *Lopez* make a comparable contract claim, but the issue was argued to the Federal Circuit in the *Lopez* appeal and discussed in that court's affirmance of the dismissal. *See* 858 F.2d at 718–19. The Federal Circuit held that asbestos manufacturers could not

obtain a recovery from the Government under the doctrine of superior knowledge, since, even assuming, *arguendo*, that the Government possessed knowledge superior to that of the manufacturers, third-party plaintiffs did not meet their burden of showing that the Government was aware that the suppliers needed additional information. The appeals court was unwilling to extend the doctrine of superior knowledge to include a duty to inform an experienced asbestos product manufacturer that its products were defective since such an extension would be "judicial legislation." 858 F.2d at 718. To prevail in the Claims Court on this claim, plaintiff must show that the facts of its case fit squarely within the traditional bounds of a superior knowledge claim. Plaintiff must show that

> a contractor (1) undertakes to perform without vital knowledge of a fact that affects performance costs or [duration], (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government failed to provide the relevant information....

*Lopez*, 858 F.2d at 717 (citing *American Ship Bldg. Co. v. United States*, 228 Ct.Cl. 220, 654 F.2d 75 (1981)).

### FACTS

The following facts are those that are material to defendant's motion and either undisputed facts as framed by defendant, *see* RUSCC 56(d)(2), or the version of events described by plaintiff in its Rule 56(d)(2) response. One of plaintiff's predecessor entities was the Ruberoid Company. During 1920–1930 Ruberoid acquired and merged into its operations several other companies which commercially produced and sold asbestos-containing products. One of Ruberoid's predecessor's was Eternit, Inc. Ruberoid defended against lawsuits in which plaintiffs alleged injuries from the manufacturing process engaged in by Eternit and arising from a variety of dusts, including asbestos, cement, silica, and lime. During this period Ruberoid also mined raw asbestos fiber.

Before the turn of the century, H.F. Watson Company, a manufacturing concern with plants in Erie, Pennsylvania and Chicago, Illinois, produced asbestos papers, millboard, and pipe coverings for pipe and boiler insulation. In 1929 H.F. Watson was merged into Ruberoid, which, the following year, began to operate H.F. Watson as a division of Ruberoid, continuing without interruption in production of such asbestos products. As early as 1928, Eternit, Inc., St. Louis, Missouri, a manufacturer of asbestos cement products, was soliciting the United States Navy's Bureau of Yards for the purpose of securing lists of asbestos cement products which could be sold to the Navy. In 1930 Ruberoid acquired a controlling interest in Eternit. Two years later Ruberoid had acquired the remaining capital shares of Eternit and consolidated the company's liabilities and assets. Thus, according to Ruberoid's own corporate history published in 1965, "[i]n 1930, the company became an important producer of mineral fiber (* new designation for asbestos cement) building materials...."

As a result of the acquisition of Eternit, Ruberoid became a defendant in a number of lawsuits (at least 12) brought by Eternit employees in the mid–1930's alleging asbestos-related injuries due to exposure to a variety of dusts, including cement, silica, lime, and asbestos dusts apparently created in the process of manufacturing of asbestos-related products. At least five of these suits were settled by cash payments to plaintiffs. At the quarterly meeting of Ruberoid's Board of Directors held on February 26, 1935, the president reported on those St. Louis lawsuits and contemplated steps to be taken with a view toward safeguarding "ourselves against dust hazards." At the next quarterly meeting, however, the acting chairman reported "the difficulty in insuring ourselves against occupational diseases." Plaintiff took such steps to safeguard the workplace, and between the 1930's and the mid–1960's Ruberoid experienced only two similar workers' claims from any of its facilities.

With the advent of the National Industrial Recovery Administration in 1933, during

the first phase of the New Deal, Ruberoid became a member of both the Asbestos Paper and Allied Products Division and of the Asbestos Cement Products Division of the National Industrial Recovery Administration's Asbestos Industry Code Authority. In this period Ruberoid was involved in discussions concerning licensing of patents within the context of the Asbestos Paper and Allied Products Division. On November 8, 1934, Ruberoid entered into an agreement with Johns–Manville Corporation licensing Johns–Manville patents Nos. 1,628,680 and 1,628,681. In addition, in 1936, Ruberoid took steps to enter into the mining of raw asbestos fiber, arranging for the purchase, through a subsidiary, of a mine belonging to Vermont Asbestos Corporation, in Eden, Vermont. The sales manager of that subsidiary, Vermont Asbestos Products Co., Inc., in a letter dated September 16, 1936, to an official of the Bureau of Mines of the Department of the Interior, characterized Ruberoid as a "national [manufacturer] of asbestos and asphalt roofing and building materials." He also described Ruberoid's actions in Vermont as facilitating "increase[d] production of Vermont asbestos" and the "furnish[ing] of a more complete line of the various shorter grades."

In its 1937 Annual Report, Ruberoid listed a net dollar sales volume of over $16 million. The net sales of the asbestos industry leader, Johns–Manville, for 1937 were just over $60 million. The report noted the production of asbestos products, including: Asbestos (chrysotile) fibers for boards, brake linings, cements, clutch-facings, felts, millboard, molded products, paints, papers, shingles and sidings, corrugated asbestos-cement sheets, flat sheets of asbestos cement, asphalt-impregnated asbestos felt, asbestos felt, asbestos cellular pipe coverings and blocks, asbestos cement, asbestos laminated pipe coverings, asbestos millboard, asbestos paper, asbestos roll-board, magnesia (85 percent) pipe coverings and blocks, asbestos boards, asbestos molded boards, asbestos felt base, and asbestos cement.

On June 4, 1941, Ruberoid provided the War Department with its RUBEROID In-sulation Catalogue, in which it listed a wide range of its commercially available asbestos insulation products, including its asbestos-containing 85 percent Magnesia Sectional Pipe Covering, and a long list of commercial customers of its products. Although plaintiff marketed 85 percent thermal insulation products to the Government, plaintiff did not then manufacture them. Plaintiff did represent itself to the Government through this catalogue as capable of supplying such products.

In the period of June–August 1947, Ruberoid purchased from the Reconstruction Finance Corporation, a federally-owned and controlled entity, amounts of raw asbestos fiber for approximately $350,000.00. These contracts contained no express warranties whatsoever or disclaimers of any warranties.

Ruberoid continued in the business of mining raw asbestos fiber itself in Vermont. At a board meeting held on November 21, 1950, Ruberoid's chairman outlined a 1951 program for exploration, core drilling, and development of further Vermont properties. Several months later, on June 27, 1951, the Defense Minerals Exploration Administration (the "DMEA") of the United States Department of the Interior mailed Ruberoid an exploration contract, pursuant to which the Government provided Ruberoid with funds with which to explore for raw asbestos fiber. There is no allegation that this contract contained any warranties by the Government that the raw asbestos fiber mined as a result of Ruberoid's acceptance of this assistance would be safe for use in products the industry would produce. Based on Ruberoid's submission of statements of the work done, the Government agreed to pay for 90 percent of the work, up to $64,400.40. At a corporate meeting held in October 1951, it was reported that Ruberoid's Vermont mine would produce 48,000 tons of fiber that year—an increase of 26 percent over the past year. Ruberoid intended to use about half of that amount in its own product manufacturing plants.

The DMEA/Ruberoid contract was entered into pursuant to the Defense Produc-

tion Act of 1950, Pub.L. No. 774, 64 Stat. 798, 50 U.S.C.App. §§ 2061–2166. As the legislative history of that Act demonstrates, Congress deemed it necessary, in light of defense requirements occasioned by the outbreak of the Korean War, to facilitate, among other things, private "production of essential materials, including the exploration, development, and mining of strategic metals and materials." The United States assisted Ruberoid in developing additional asbestos reserves in order to induce Ruberoid to produce additional asbestos fiber to be used in products purchased by the United States for its defense needs.

## DISCUSSION

### 1. *Summary judgment standards*

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). Only disputes over material facts, or facts that might significantly affect the outcome of the suit under the governing law, preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine if the evidence would permit a reasonable jury to return a verdict in favor of the non-movant. *Id.* Defendant, as the moving party, has the burden of establishing that there are no genuine material issues in dispute and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

As the party opposing the motion, plaintiff has the burden of providing sufficient evidence, not necessarily admissible at trial, to show that a genuine issue of material fact indeed exists. *Celotex*, 477 U.S. at 322, 324, 106 S.Ct. 2548, 2553.

> To create a genuine issue of fact, the non-movant must do more than present *some* evidence on an issue it asserts is disputed. The Court stated:
>
>> [T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the

evidence [of the nonmovant] is merely colorable, or is not significantly probative, summary judgment may be granted.

*Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1560 (Fed.Cir. 1988) (emphasis in original) (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted), and citing *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)). However, any evidence presented by plaintiff is to be believed and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513–14. In resolving defendant's motion, the court cannot weigh the evidence and determine the truth of the matter on summary judgment. *Id.* at 249, 255, 106 S.Ct. at 2511, 2513. Uncontested material facts have been found consistent with the rule that, in respect of any facts that may be considered as contested, plaintiff, as the opponent of summary judgment, is entitled to "all applicable presumptions, inferences, and intendments." *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed. Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

Summary judgment pursuant to RUSCC 56 properly can intercede and prevent trial if defendant can demonstrate that trial would be useless in that more evidence than is already available in connection with its motion could not reasonably be expected to change the result. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626 (Fed.Cir.1984). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut but, rather, as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action....'" *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555 (quoted in *Avia Group Int'l*, 853 F.2d at 1560, and *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987)).

Rule 56 must be construed with due regard not only for the rights of persons

asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555; *see also Universal Life Church, Inc. v. United States,* 13 Cl.Ct. 567, 580 (1987) (citing cases), *aff'd,* 862 F.2d 321 (Fed.Cir. 1988) (Table). A trial court may deny summary judgment, however, if "there is reason to believe that the better course would be to proceed to trial." *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513 (citation omitted).

■ The court's review of the materials presented on summary judgment reveals that plaintiff has not put forth sufficient evidence to constitute a genuine issue of material fact. In opposing defendant's summary judgment motion, plaintiff was required to come forward with that quantum of evidence. Moreover, the court in its discretion can find no justification for a trial on the issues raised by defendant. Although plaintiff put forward some allegations different than those in *Lopez,* the outcome is not affected when *Lopez* squarely reaches plaintiff's claims. For example, plaintiff attempts to distinguish itself from the asbestos manufacturers in *Lopez* by alleging that it both sold raw asbestos fiber to the Government and that the Government gave plaintiff financial assistance to develop domestic sources of raw asbestos fiber. However, in respect of its claim to a warranty of specifications, plaintiff has not made a showing that the asbestos insulation products it sold to the Government differed in any material respect from those it sold to its commercial customers. *See* note 2 *infra.* Moreover, according to *Lopez,* the crux of an actionable superior knowledge claim is a showing by a contractor that the Government has reason to believe that a contractor was not already knowledgeable. Plaintiff's additional averments do not constitute such a showing.

## 2. *Plaintiff's showings under the holdings in Lopez*

Defendant's moving brief accurately capsulated the holdings in *Lopez.* The Federal Circuit in *Lopez* restated the well-established principle that to establish Tucker Act jurisdiction a claimant must allege the violations of either the express terms of a contract or of a contractual obligation implied-in-fact; an implied-in-law obligation does not state a claim under the Tucker Act. 858 F.2d at 714–15. It also noted that "it is not now contended that the contracts or purchase orders contained any written warranties to sellers...." *Id.* at 714. Thus, the question was whether an implied-in-fact obligation could be discerned. The court held that only where the "circumstances strongly supported a factual inference that a warranty was implied...." had the courts found such an obligation, *id.* at 715, and concluded that there were no such circumstances alleged. *Id.* at 716.

The Federal Circuit agreed with the district court that "an implied warranty relating to the use by the buyer after delivery, and warranting it would not harm the seller is novel, and no reason is shown why anyone could have so supposed at the date of sale by any inference from the circumstances...." that such a warranty had been made. *Id.* The court's "appreciation of the bizarre and novel nature of the 'reverse warranty' here asserted, and its lack of support in the alleged facts or the court decisions," led it to conclude that "the Tucker Act does not provide means to enforce the alleged warranty here...." *Id.* at 716–17.

Noting that, under the Tucker Act, there were "limits on the scope of breach liability for nondisclosure of superior knowledge," the court denied the manufacturers' assertions that the Government should be held liable to them in contract on the theory that the Government had failed to disclose superior knowledge regarding the hazards of asbestos. *Id.* at 717. The court stated that the Government "might reasonably suppose Raymark and Eagle–Picher knew enough about asbestos and its perils not to

need to learn more about it from the government." *Id.*

**2.** Plaintiff, either through its counter-statement of facts or statement of uncontroverted facts not covered by defendant's statement filed pursuant to RUSCC 56(d)(2), raises a number of factual issues, disputed to be sure, that are not material.

1. Whether plaintiff and its predecessors were aware of the health risks posed by exposure to finished products containing asbestos.

Defendant contends that plaintiff, as a knowledgeable and experienced manufacturer and seller of asbestos products, was in the same position vis-a-vis the Government as that in which the *Lopez* court found Raymark and Eagle–Picher, *i.e.*, knowledgeable "enough about asbestos and its perils not to need to learn more about it from the government." 858 F.2d at 717. Plaintiff was on notice of the asbestos hazard in part because of suits filed against plaintiff's predecessors Eternit and Ruberoid by employees who claimed to have developed diseases as a result of exposure to asbestos dust. While not contesting that these suits were filed and admitting that some of them were settled, plaintiff submits that circumstances surrounding the suits were such as not to put plaintiff on notice that exposure to finished asbestos products in a shipyard setting posed a health risk. First, the pleadings in the suits did not single out asbestos exposure as the cause of harm (PPF 15), but, rather, alleged that exposure to "injurious, noxious mineral dusts containing asbestos, cement, silica and lime" had caused respiratory disease. However, plaintiff does not dispute that asbestos was identified as a causative agent, and the court has found accordingly. Second, those suits were brought by workers who were involved in the manufacturing of Eternit's and Ruberoid's products, whereas the injuries underlying the case at bar were to workers exposed to finished asbestos products cut and installed in ships. (PPF 15) Plaintiff does not emphasize whether the risk to health i the two situations was actually different, but presents support for the contention that plaintiff in fact may not have been aware that its products carried a health risk after they left the factory. (PPF 12–13)

For example, Phillip S. Bettoli, who was employed by Ruberoid in 1945 as a research chemist and in 1967 when the company merged with plaintiff became its Technical Director of the Building, Industrial and Floor Product Division, testified that he

> was not aware and to the best of my knowledge, no one at Ruberoid was aware, that finished asbestos products, such as insulation, presented any risk of asbestos-related diseases to users of such products, such as insulation workers. Until the 1960's I had never heard such a hazard discussed at Ruberoid or anywhere else.

Affidavit of Phillip S. Bettoli, Nov. 10, 1989, ¶ 10. E.J. O'Leary, who was hired in 1930 by Ruberoid as a sales representative and who be-

Defendant also accurately poses the issues on summary judgment under *Lopez:* [2]

came president of the company in 1958, averred that, until the mid–1960's, he was unaware that exposure to finished asbestos products posed a health hazard. Affidavit of E.J. O'Leary, Nov. 9, 1989, ¶ 4.

To bolster. its position that Ruberoid knew enough and needed no information from the Government about the risks of asbestos exposure, defendant points to two instances where members of the Ruberoid Board of Directors, in presentations to the full Board, expressed concern about dust diseases. Since the references are imbedded in discussions of internal company matters, they were arguably concerns about exposure of Ruberoid employees during the manufacturing process, as opposed to indicators of knowledge that exposure to asbestos products after they had left the manufacturer held any danger. However, plaintiff does not put forth a triable issue whether exposure to finished asbestos products constituted a hazard different in any way from exposure to asbestos in the manufacturing process. (PPF 13) *Lopez* drew no such distinction. 858 F.2d at 717 ("They [Raymark and Eagle–Picher] say the buyer owed them a duty to tell them their product was defective, intrinsically or as actually used. Such contention is new to the 'superior knowledge' doctrine and does not fit it at all well....").

2. Whether the Government had reason to know of plaintiff's lack of knowledge about the risk of exposure to finished asbestos products.

The *Lopez* court based its ruling that the facts before it did not support a breach for failure to reveal superior knowledge on an assumption only that the Government's knowledge was superior and on the presumption that the Government had no basis for believing that an experienced maker of asbestos products needed to learn more about the mineral's inherent risks from its purchaser. *Id.* at 717. Plaintiff advances two factual contentions to distinguish itself from that presumption and to support its position that not only was it unaware of the risk posed by exposure to asbestos products, but that the Government had reason to know it lacked that knowledge. First, plaintiff delineates the evolution of medical· knowledge of asbestos risks until 1964 and 1965 when two papers by I.J. Selikoff were published. Until then, the literature indicated that findings in manufacturing settings were not transferable to shipyards and that there were no clear indications of health problems resulting from use of finished asbestos products. (PPF 38–44) Second, plaintiff traces the medical studies done within and commissioned by the Government that indicate a clear concern about the health risks of asbestos exposure (PPF 20–35), as well as several internal communications indicating an active effort to keep this knowledge from being available to labor groups. (PPF 24–25)

Plaintiff's contention, as summarized in a chart introduced during argument, is that *Lopez*

should be restricted to its presumption that government officials knowingly could not have exposed their own employees to asbestos hazards, since Raymark and Eagle–Picher did not allege to the contrary. Thus, plaintiff characterizes its showing in opposing summary judgment as sufficient to show that "[t]he Government did knowingly expose its own employees to asbestos hazards." Exhibit A to Transcript of Proceedings, *GAF Corp. v. United States,* No. 287–83C (Cl.Ct. Jan. 5, 1990). The materials relied on by plaintiff, taken in their most favorable light, *i.e.,* that least favorable to the Government, indicate that the Government identified use (fitting and installation) of asbestos insulation products in its shipyards as posing a hazard in the workplace and identified this hazard, among others, for monitoring, correcting, and safeguarding against. Even if the issue was what the Government knew and not what it reasonably could have supposed that plaintiff knew, plaintiff's showing falls short of putting in issue whether the Government knowingly exposed its employees to asbestos hazards, as opposed to the proposition that the Government was aware of asbestos hazards in the shipyards. Plaintiff's counsel at argument surmised that the result in *Lopez* would not control if discovery were to reveal a document showing that the Government in 1952 said, " 'We now know that our asbestos workers are going to die and we know nobody knows that, but we are not going to tell anybody....' " Transcript of Proceedings, No. 287–83C, at 70 (Cl.Ct. Jan. 5, 1990). The Federal Circuit has instructed that "[s]ummary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support the complaint...." *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d 624, 627 (Fed.Cir.1984) (citation omitted).

3. Whether plaintiff's entry into production of Calsilite was at the behest of the Government. (PPF 8)

Defendant contends that in 1942 Ruberoid approached the Bureau of Ships of the United States Navy with a proposal to use its newly-developed Calsilite insulation material, which, Ruberoid stated, would be superior to its own 85 percent magnesia and other products for insulating "pipes, boilers and other equipment on ships being constructed by the U.S. Navy." According to plaintiff, in 1942 Ruberoid approached the Bureau of Ships in order to propose that the Navy consider ascertaining whether Calsilite met preexisting government design specifications.

The parties agree that in September 1942 the Bureau of Ships, at Ruberoid's request, authorized the testing of Calsilite insulation and was sent a "commercial sample" of Calsilite insulation molded pipe covering for the test. In August 1943 the Navy informed Ruberoid that its Calsilite products were approved for Navy use. Plaintiff posits that Ruberoid had never manufactured this product, did not do so until 1944,

and did not do so for any other purchaser than the Government until 1949. In 1944 Ruberoid began to sell such materials to the Navy in contracts which contained no express warranties by the purchaser (the Government) regarding the safety of the products. Plaintiff alleges sales of Calsilite and other products during this period and for the next 27 years, but does not allege that any of the contracts contained such express warranties.

In response to defendant's contention that the formula for, and production of, Ruberoid's Calsilite insulation was initiated by Ruberoid, plaintiff presents evidence that the product was not sold commercially before it was presented to the Navy for testing for compliance with its specifications and that the product was developed specifically to meet existing Navy Specifications 32–I–3 (INT) and 32–P–8 (INT). Although the testimony of Mr. Bettoli to the effect that the Navy revised its specifications around Calsilite does not refer to the 1954 revision that plaintiff cites to support its contention, the court makes no finding on point, since the case is on summary judgment. Plaintiff further contends that Calsilite was Ruberoid's only product to use amosite asbestos. (PPF 7, 10) However, plaintiff does not make a showing that of the commercial asbestos-containing products that it manufactured only amosite was hazardous. *Lopez* requires such a showing. 858 F.2d at 715–16; *see Johns–Manville Corp.,* 13 Cl.Ct. at 124 (failure of proof that amosite fibers more dangerous than other asbestos fibers).

The issue whether Calsilite was developed around preexisting government specifications is disputed, but it does not impede a grant of summary judgment in defendant's favor. This court ruled in *Johns–Manville Corp.,* consonant with precedent, that the asbestos manufacturer had failed to prove that the design specifications were devised and drafted by the Government. *See* 13 Cl.Ct. at 119–32. There was one specification, however, in whose development the manufacturer had not intruded itself and which was drafted by the Government. This product was only manufactured after the Navy issued the subject specification. This court held that the claim to a warranty of specifications failed because "the company's extensive manufacturing experience with asbestos felt products and its awareness of the hazards associated with asbestos overshadowed any guidance from, or reliance on Navy specifications that Johns–Manville might have perceived." *Id.* at 132. The same reasoning precludes plaintiff's claim under *Lopez.*

Further, plaintiff makes showings that Ruberoid received active assistance from the Government in producing Calsilite in the form of tax amortization benefits for the purchase of needed equipment, approvals for such purchases that were needed during World War II, and following the War subsidization of Ruberoid's asbestos mining. (PPF 8) The parties disagree not on the fact that Ruberoid's exploration and mining were subsidized, but, rather, on its implications. Defendant uses the fact of governmental assist-

Whether plaintiff and its predecessors—all asbestos manufacturers—were experienced producers of asbestos-containing products, and whether the Government had no reason to think that it needed to tell plaintiffs how to make such products, particularly where the products sold to the Government were in no material respect different from those sold commercially. *See Lopez*, 858 F.2d at 716–18.

3. Plaintiff attempts to distinguish its case from *Lopez* in six particulars. First, plaintiff points out that the *Lopez* court accepted the trial court's finding that the specifications were performance type specifications. Although the lower court's finding was not appealed in *Lopez*, acceptance of that finding is implicit in a reading of the Federal Circuit's opinion. *See* 858 F.2d at 716. Second—a related point—the court in *Lopez* distinguished a construction contract "with its massive detail all prescribed

by the owner," *id.* at 715, from a supply contract and underscored that a warranty of specifications should not be implied in the latter, "except one which exacts a like conformity to the buyer's presumption of detail." *Id.* Plaintiff provides evidence that the specifications for the asbestos insulation products supplied to the Navy meet the exceptional case. This court ruled in *Johns–Manville* the same specifications were in the circumstances design specifications and that a warranty would lie if the requisite proof were forthcoming that the design specifications were drafted by the Government. *See Johns–Manville*, 13 Cl.Ct. at 131. Defendant concedes for purposes of its motion that design specifications are in issue. *See supra* note 2. Therefore, *Lopez* applies to this case because its holdings pertain to claims based on a warranty of design specifications.

ance, and the resultant increase in Ruberoid's production of asbestos, to bolster its contention that plaintiff was a major asbestos product producer and thus was not in any apparent need of information about the mineral from the Government. Plaintiff uses the fact of governmental assistance as evidence that plaintiff was encouraged to become a producer of products that complied with government-written specifications, but which were known by the Government to carry a substantial risk to health. Although the court cannot resolve conflicting evidence on summary judgment, the only conflict is the implication to be drawn from government subsidization. In view of *Lopez*'s holding that the dispositive issue is what the Government reasonably could suppose plaintiff knew, the implication plaintiff would ask the court to draw is immaterial.

4. Whether asbestos was required in insulation products in order to meet the Navy's specifications.

Plaintiff submits that in response to a request from the Navy, it attempted to develop a Calsilite substitute which would meet its specifications, but which either reduced or eliminated the use of asbestos. As a result of its efforts, plaintiff became convinced that, since the Navy would not make alterations in the specifications, they could not be met absent the use of asbestos. (PPF 6) However, plaintiff has not made a showing that the amosite fibers in Calsilite—a type of asbestos that plaintiff had not used previously—were more dangerous than the asbestos plaintiff manufactured for its commercial customers. Since *Lopez* defines the issue of superior knowledge in terms of what the Government reasonably could have expected

plaintiff to have acquired from its own experience with asbestos, 858 F.2d at 817, *see infra* note 3 (breach of warranty of specifications presumes Government's superior knowledge), plaintiff's point that the Navy's specifications required Calsilite is not material.

5. Whether the specifications for asbestos insulation promulgated by the Navy were design type.

Plaintiff contends that the specifications under which it manufactured asbestos insulation were of the design type "because the Government explicitly mandated the precise and detailed physical characteristics of the resulting product." (PPF 3). However, it was held in *Johns–Manville Corp. v. United States*, 13 Cl.Ct. at 131, that specifications requiring conformance with certain standards or characteristics were not necessarily design type. Rather, the inquiry is the degree to which the manufacturer has options available in meeting the standards. Specifications are design only when "only one material or a certain composition will enable the product to meet the performance standards expressed in the specification." *Id.* at 131. This court in *Johns–Manville* found that the specifications in issue there were design, since it was persuaded that, under the circumstances, they required the use of asbestos. Plaintiff here contends that only an asbestos-containing insulation material would have satisfied 32–P–8 (INT) and 32–I–3 (INT). (PPF 5)

Defendant concedes for purposes of argument that design specifications are in issue, but urges that plaintiff does not put forward triable issues under *Lopez* as to plaintiff's knowledge of the asbestos hazard or as to whether the products sold to the Government differ in respect of the asbestos hazard from those sold commercially. Defendant's point is well taken.

As its third basis of distinguishing *Lopez*, plaintiff quotes from the opinion:

> [The counsel for asbestos suppliers here] do not know and cannot tell us whether the government specifications differed at all from those of private customers of Raymark and Eagle–Picher, or if they did, whether the difference related to the asbestos content of the materials supplied. . . .

*Lopez*, 858 F.2d at 715–16.

Plaintiff takes the position that Calsilite, *see supra* note 2, was a brand-new product made in accordance with preexisting government specifications and manufactured exclusively for the Navy from its inception and that it was not sold to any private customer until years later. Further, plaintiff contends that prior to making Calsilite for the Navy, Ruberoid never made any other product that met the specifications involved. As discussed more fully in note 2 *supra*, this is a disputed issue of fact, but does not foreclose summary judgment. This is because the issue is not whether Calsilite or any one product was sold to the Navy in response to government-drafted design specifications, but, rather, under *Lopez* whether plaintiff has put in issue its status as an experienced manufacturer of asbestos products, the manufacture of which rendered plaintiff knowledgeable as to asbestos hazards. Defendant has offered sufficient uncontroverted material facts that plaintiff stood in the same shoes as Raymark and Eagle–Picher in the *Lopez* case insofar as plaintiff's status as an experienced producer of asbestos-containing products. It is undisputed that plaintiff sold the Navy and its commercial customers 85 percent magnesia (whether plaintiff itself produced the product), and the Federal Circuit ruled that all forms of asbestos insulation are hazardous. 858 F.2d at 716; *see id.* at 714.

> Plaintiff also argues that
>
> More important, Ruberoid's experience in manufacturing other asbestos products would not disclose the design defect in-

volved in this case—the hazard of finished insulation products to shipyard workers. The Government's experience as owner and supervisor of shipyards and employer of shipyard workers is far more relevant than Ruberoid's experience as a manufacturer.

*See* Plf's Exhibit A to Transcript of Proceedings, *GAF Corp. v. United States*, No. 287–83C (Cl.Ct. Jan. 5, 1990) (hereafter cited as "Plf's Ex. A"). The weakness in this argument is that the Federal Circuit has rejected plaintiff's statement of the pertinent design defect. Although plaintiff says that it is not sponsoring a warranty that the product would be used in a safe manner, plaintiff's own formulation of the warranty reflects a use concept. For example, plaintiff frames the warranty, as follows: "These specifications were defective simply because the asbestos insulation products produced in conformity with them were hazardous to shipyard workers." Plf's Br. filed Jan. 5, 1990, at 5. Similarly, "[t]he government has not offered any evidence that this activity [installation of pipe covering in Ruberoid facilities] gave rise to any injuries or gave Ruberoid any meaningful experience that would have put it on notice of hazards of finished asbestos products to shipyards insulation workers. . . ." *Id.* at 3. Whereas *Lopez* identifies the asbestos hazard as asbestos itself, plaintiff insists that the hazard stems from finished insulation products to shipyard workers. *Lopez* rejects plaintiff's formulation:

> They say the buyer owed them a duty to tell them their product was defective, intrinsically or as actually used. Such a contention is new to the "superior knowledge" doctrine and does not fit it at all well. It does not deal, for example, with how the government is supposed to know the supplier of asbestos needs information about asbestos it does not have. . . .

*Lopez*, 858 F.2d at 717.[3]

Fourth, plaintiff points to the following passage of *Lopez*: "It is not shown how

---

**3.** Although the Federal Circuit was discussing the Government's duty to reveal superior knowledge, the cause of action for breach of the implied warranty of government-designed specifications requires that the Government must have equal or greater knowledge of the defect

the government could have supposed it needed to tell Raymark and Eagle–Picher how to make asbestos insulation, or how they needed to rely on such instructions." *Id.* at 716. Plaintiff argues that the defect in the specifications—the hazards posed by finished asbestos products to shipyard workers—was one that the Government could not have supposed that Ruberoid knew. Plaintiff contends that the medical community was ignorant of this danger, *i.e.,* the danger of finished asbestos products, in contrast to the danger in the manufacturing setting, and that, therefore, Ruberoid's experience as a manufacturer was not relevant to appreciation of this hazard. As stated previously, *Lopez* rejected plaintiff's formulation of the pertinent warranty. Plaintiff's other arguments on this point flow from its premise and are without merit.

Fifth, plaintiff draws on the language of *Lopez* that "[t]he government might reasonably suppose Raymark and Eagle–Picher knew enough about asbestos and its perils without the need to learn more about it from the government...." *Lopez,* 858 F.2d at 717. *Lopez* stated that the superior knowledge doctrine "does not deal, for example, with how the government is supposed to know the supplier of asbestos needs information about asbestos it does not have." *Id.* In response to these statements from *Lopez,* plaintiff argues,

> Since the Government conducted classified studies on health conditions in the shipyards and never disclosed the hazards even to the workers exposed to them, and since the medical community did not view finished products as a hazard to users at the time, the Government could not reasonably suppose Ruberoid knew about the risk of disease to shipyard workers exposed to finished products.

Plf's Ex. A. Once again, *Lopez* does not acknowledge plaintiff's formulation of the

warranty. Moreover, plaintiff cannot claim that Raymark and Eagle–Picher argued for a different warranty so that, somehow, *Lopez* may be read as allowing a distinction between diseases arising from the manufacture of asbestos products and the risk of diseases to shipyard workers exposed to finished products. Raymark and Eagle–Picher manufactured finished asbestos products of the same type as plaintiff and its predecessors.

Sixth, plaintiff cites dictum in *Lopez:* "We must presume that government officials acted in good faith, the contrary not being alleged. Acting in good faith, they could not have knowingly exposed their own employees to undue asbestos hazards...." 858 F.2d at 717–18. Plaintiff rejoins: "The Government did knowingly expose its own employees to asbestos hazards." Plf's Ex. A. The court elsewhere has pointed out that the evidence offered by plaintiff on summary judgment does not precisely support plaintiff's statement. *See supra* note 2. However, even if it did, nothing in *Lopez*'s decision suggests that the existence of a genuine issue of fact on point would fall outside the scope of its holding. Immediately following the quoted language, the *Lopez* court rejected the concept of the duty of the customer to inform the supplier that the latter's product was defective when the supplier is an experienced producer of asbestos products. In addition, the dictum, if treated with any more significance than an aside, would not be consistent with *Lopez*'s holding that warranty of specifications does not reach actual "use." 858 F.2d at 716.

Plaintiff is troubled by the Federal Circuit's later holding in *Blount Brothers Corp. v. United States,* 872 F.2d 1003 (Fed. Cir.1989), which appears inconsistent with *Lopez.* In that case the court upheld the warranty of specifications in favor of an experienced construction contractor—with more expertise in gravel than the Govern-

---

than the contractor in order for the Government to be held responsible for drafting specifications. *Bethlehem Corp. v. United States,* 199 Ct.Cl. 247, 254, 462 F.2d 1400, 1404 (1972). Later the Court of Claims characterized the relative knowledge component, as follows: The

Government was aware that the contractor had "no knowledge of and no reason to obtain" "vital information" that affects performance costs. *American Ship Bldg. Co. v. United States,* 228 Ct.Cl. 220, 225, 654 F.2d 75, 79 (1981).

ment—when the Government insisted that plaintiff use one aggregate with a specific composition and the contractor could not supply it. The Federal Circuit held that the contractor's inability to find a source— and the Government could not, as well—resulted from defective specifications.

This case is distinguishable from *Blount* on two grounds. First, the nature of the increased costs of performance, which the contractor in *Blount* was awarded because the contract could not be successfully completed, differs. In *Johns–Manville* this court rejected third-party liabilities as within the contemplation of costs of performance in connection with supply contracts. *See* 13 Cl.Ct. at 159–61; *Johns–Manville Corp. v. United States*, 12 Cl.Ct. 1, 28 (1987) (opinion on motion for judgment on the pleadings). Relief measured by the monetary consequences of the failure of a building to function as designed due to the passage of time and not due to the subsequent actions of an actor, even if the defect is discovered years after the construction is completed, *see Poorvu v. United States*, 190 Ct.Cl. 640, 420 F.2d 993 (1970), represents the outer limits beyond which costs of performance have not been taken. Judicial recognition has not been extended to the notion that a supply item produced according to specifications in a satisfactory manner, yet causing damages due to its use, can be the basis of a claim to recover damages as costs of performance. Second, it is important to note, as defendant points out—as did the court in *Lopez*—that the losses suffered by plaintiff were occasioned by its own tort liability, *viz.*, liability for failure to place warnings on its asbestos products. *See Lopez*, 858 F.2d at 717.[4]

Defendant has established its entitlement to summary judgment under the standards of RUSCC 56(c), since it has established

that plaintiff has no claim under *Lopez* based on the warranty of design specifications or the failure to reveal superior knowledge. Correspondingly, plaintiff has failed to raise a genuine issue of material fact requiring trial on the issue of whether plaintiff can take its case outside *Lopez*. Unquestionably, plaintiff offers some evidence that distinguishes its case from *Johns–Manville;* however, it does not make the requisite showing in respect of Raymark's or Eagle–Picher's cases in *Lopez;* and *Lopez*, not *Johns–Manville*, is the precedent that plaintiff must overcome. Plaintiff's case has been evaluated under the standards for summary judgment. *Lopez* addressed a motion to dismiss complaints for failure to state claims. Notwithstanding the different posture of the cases, the *Lopez* holdings would apply even if the matter were being reviewed after trial, to the extent that *Lopez* states legal propositions that are not limited to the nuances of the complaints in review in that case.

### 3. *Plaintiff's claim based on warranty of merchantability and fitness*

◼ Plaintiff's third claim for relief is styled as "a Breach of Implied Warranty in the Sale of Raw Asbestos by the United States." Plaintiff avers:

> In selling raw asbestos to GAF without warning or caution, the United States impliedly warranted that such raw asbestos was safe, merchantable, and fit for its intended purpose. GAF reasonably relied on this implied warranty in purchasing raw asbestos from the United States and in producing thermal insulation products containing this asbestos for the United States.

Compl. filed May 5, 1983, ¶ 60. Plaintiff grounds its warranties in the Uniform

---

**4.** The Federal Circuit in *Lopez* also was of the view that the Supreme Court's decision in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), undermines the asbestos manufacturers' claims, since, if the Government and the manufacturers were so intimately involved in specifying and producing

asbestos products, the manufacturers should have been able successfully to invoke the government contractor defense. This discussion was not essential to the *Lopez* holdings that control in this case. However, defendant's briefing on this point sufficiently demonstrates

Commercial Code.[5] As to merchantability, UCC § 2–314 provides:

(1) Unless excluded or modified ..., a warranty that the goods shall be merchantable is implied in any contract for their sale if the seller is a merchant with respect to goods of that kind....

UCC § 2–315 establishes a warranty of fitness:

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified ... an implied warranty that the goods shall be fit for such purpose.

Judge Gignoux in *In re All Maine Asbestos Litigation*, 581 F.Supp. 963, 973 (D.Me. 1984), *aff'd*, 854 F.2d 1328 (Fed.Cir.1988) (Table), characterized this type of warranty as an obligation implied in law and consequently dismissed the claim. A contractual warranty implied in law cannot be asserted against the United States. *Hatzlachh Supply Co. v. United States*, 444 U.S. 460, 465 & n. 5, 100 S.Ct. 647, 650, & n. 5, 62 L.Ed.2d 614 (1980); *Lopez*, 858 F.2d at 714–15. Plaintiff attempts to distinguish *All Maine Asbestos Litigation* on the ground that the contracts of the asbestos product manufacturers in that case contained express disclaimers of any warranties. Defendant responds that in *All Maine Asbestos Litigation*, as in this case, the contracts contained no express warranties. Plaintiff has made no showing upon which to predicate any understanding to support a warranty implied-in-fact. Moreover, the undisputed facts material to this question reveal that plaintiff was an experienced miner of asbestos since 1936, eleven years before the Government began to sell raw asbestos to plaintiff. UCC § 2–315 predicates its warranty on a finding that plaintiff was relying on the Government's skill or judgment to select

asbestos fibers to sell to it. Plaintiff as an experienced miner of asbestos fiber is not in a position to invoke this warranty, even if it could be construed as other than one implied in law. Accordingly, defendant has established its entitlement to summary judgment on this claim, and plaintiff has not offered any factual showing to defeat a grant of the motion.

CONCLUSION

Based on the foregoing, defendant's motion for summary judgment is granted. The Clerk of the Court shall dismiss the complaint.

IT IS SO ORDERED.

No costs.

---

that the Federal Circuit's discussion applies to plaintiff's case, as well.

**5.** There is no dispute that the UCC was not promulgated until 1951 and that the Uniform

Sales Act contained provisions identical to UCC §§ 2–314 and 2–315. *See* Uniform Sales Act § 15, *reprinted in 8 Williston on Contracts* § 981 (3d ed.1964).