ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Meltech Corporation, Inc. | ) ASBCA No. 63556 |
| | ) |
| Under Contract No. W912DR-14-D-0021 | ) |

APPEARANCES FOR THE APPELLANT:   Leonard A. Sacks, Esq.
   Leonard A. Sacks & Associates, P.C.
   Rockville, MD

   Fred A. Mendicino, Esq.
   Brian M. Silver, Esq.
    Faughnan Mendicino PLLC
    Dulles, VA

APPEARANCES FOR THE GOVERNMENT:   Michael P. Goodman, Esq.
   Engineer Chief Trial Attorney
   Adam J. Kwiatkowski, Esq.
   Engineer Trial Attorney
   U.S. Army Engineer District, Baltimore

OPINION BY ADMINISTRATIVE JUDGE CATES-HARMAN
ON APPELLANT'S MOTION FOR SUMMARY JUDGMENT ON
SUPERIOR KNOWLEDGE

This appeal arises from a contract between Meltech Corporation, Inc. ("Meltech" or "appellant"), and the U.S. Army Corps of Engineers ("USACE" or "respondent") for a Multiple Award Task Order contract (MATOC) that included both Design-Build and Design-Bid-Build construction projects within the Baltimore District Area of Responsibility, and the September 30, 2014 award by USACE of a Firm-Fixed-Price (FFP) Task Order No. 0002 to Meltech for all costs in connection with the renovation, design and construction of Building 8609, located at Ft. Meade, MD. (R4, tabs 28 at 1-2; 29 at 1-2). This appeal is related to fifteen (15) other appeals that were consolidated and heard by the Board.[1]

---

[1] ASBCA Nos. 61694, 61762, 61763, 61764, 61765, 61766, 61767, 61869, 61870, 61871, 61872, 62091, 62987. The lead appeal is ASBCA No. 61694. A decision on summary judgment was issued on ASBCA Nos. 61706 and 61768 on December 17, 2021.

Before hearing the related appeals, appellant filed a motion for leave to amend the complaint to add three (3) additional counts: differing site condition, superior knowledge, and breach of the duty of good faith and fair dealing. On June 11, 2020, the Board issued an unpublished decision granting appellant's request to amend the complaint to add differing site condition and denied the counts of superior knowledge and breach of the duty of good faith and fair dealing. The Board held that we lacked jurisdiction to hear the count of superior knowledge or breach of the duty of good faith and fair dealing. *Meltech Corp.*, ASBCA Nos. 61694, 61706, 61762 (Slip Op'n, June 11, 2020). In the interim, on April 9, 2020, Meltech filed a certified claim with the contracting officer relating to its assertions of superior knowledge and a breach of the duty of good faith and fair dealing. The contracting officer denied the claim on July 2, 2020. Meltech did not appeal the COFD to the ASBCA within the 90-day statutory deadline. Instead, on July 1, 2021, one day shy of the one-year statutory deadline, Meltech filed a complaint in the United States Court of Federal Claims. *See* 41 U.S.C. § 7104(b)(3). On February 13, 2023, the Court of Federal Claims ordered the transfer of Case No. 21-1532C to the ASBCA pursuant to 41 U.S.C. § 7107(d) (Notice of Appeal dtd. March 8, 2023). The transferred case has been assigned ASBCA docket number 63556.

On May 8, 2024, appellant filed a motion seeking summary judgment on its claim based upon superior knowledge. Appellant alleges that "[i]n violation of its contractual and regulatory obligations, USACE knew and failed to disclose material and vital information to Meltech that adversely impacted its costs and time of performance." Meltech states that the vital information withheld includes: "(1) USACE knew there were no as-built drawings of Building 8609; (2) USACE knew other TBUP Buildings required destructive testing to discover the actual strength of the existing structural concrete; and (3) USACE knew the strength of the concrete in Building 8609 was likely below the 3,000 pounds per square inch (psi) threshold presumed in the design standards incorporated into the Contract." (App. mot. at 1) Meltech presents facts that it maintains are undisputed and entitle it to summary judgment on its claim of superior knowledge. The government challenges each material fact that appellant maintains entitles it to summary judgment as a matter of fact and law. For the reasons stated below, we find that there are material facts in dispute preventing us from entering summary judgment.

<u>STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION</u>

1. On June 10, 2014, USACE issued a Request for Proposals (RFP) for a Multiple Award Task Order Contract (MATOC) that included both design-build and design-bid-build construction projects within the Baltimore District Area of

Responsibility. This was Phase 1 of a two-phase construction procurement. (Joint Stipulations of Fact (JSOF)[2] ¶ 1; R4, tab 2)

2. USACE selected a pool of eight successful offerors from Phase 1. Only those qualified offerors were permitted to submit proposals in Phase 2. Meltech was one of those offerors. (JSOF (GB) ¶ 2))

3. The MATOC included the renovation of several similar dormitory buildings at Ft. Meade, including Building 8609 (TBUP) (JSOF (GB) ¶ 3)).

4. USACE contracted with Black and Veatch ("B-V") to prepare the RFP for Building 8609, which was the final building in the Fort Meade TBUP program. (JSOF (GB) ¶ 4)).

5. B-V's contract provided that the "architectural programming for this building has already been developed during the design of TBUP buildings 8478/8479, 8545, and 8606" (app. supp. R4, tab 351 at 6). B-V's contract provided that USACE would provide as-built drawings, along with other items from buildings 8606 and 8545, and the previous RFP's for TBUP buildings 8478/8479, 8545, and 8606. However, B-V could not recall if the as-builts were provided to it by USACE. (App. supp. R4, tabs 351 at 11; 722 at 32-34; tr. 8/32-34, 195-96).

6. A value engineering report for Building 8545 includes the following excerpt:

> ORIGINAL DESIGN: No structural drawings are available.
>
> PROPOSED DESIGN: "Perform destructive testing" prior to awarding the structural design contracts.
>
> . . .
>
> JUSTIFICATION/DISCUSSION: Building[s] 8478 and 8479 both experienced critical construction delays due to a lack of available structural information. Their destructive

---

[2] On September 7, 2022, the parties filed Joint Stipulations of Fact that included general background stipulations and stipulations related to several of the appeals pending before the Board. For purposes of this motion, the "General Background" stipulations, ¶¶ 1-18, will be cited as JSOF (GB), and the appeal-specific stipulations "Structural Concrete – ASBCA Nos. 61694, 62987" ¶¶ 1-49, will be cited as JSOF (SC).

testing revealed the reinforcement conditions only after the contract was well underway. (App. supp. R4, tab 468)

7. In response to whether B-V did any testing of the building concrete to determine its psi, Mr. Randall Gowler, B-V's design manager for the project, testified that there would be no way "short of cutting out part of the concrete" to determine the psi of the concrete in the building. (Black & Veatch depo transcript, Mr. Randall Gowler; app. supp. R4, tab 722, at 10, 36).

8. On August 14, 2014, USACE issued Amendment 0003 to RFP W912DR-14-R0003 for two seed projects under the MATOC to provide Design Criteria for the Design-Build renovation of Building 8609 at Fort Meade and Building 4501 at Aberdeen Proving Ground. Each task order was to be awarded separately. (JSOF (GB) ¶ 7)).

9. On September 4, 2014, B-V provided responses to USACE concerning offerors' questions with respect to Building 8609's RFP (JSOF (GB) ¶ 9)).

10. Pre-bid question 64 requested "existing as-built drawings for ATFP evaluation. If existing drawings are not available, please provide the following: composition and thickness(es) of existing exterior wall components; load or non-load bearing; floor to floor height; typical window/door opening sizes (TBUP)". Pre-bid question 142 submitted to USACE requested the following: "Please provide a complete structural set of drawings including but not limited to: Concrete design strength, reinforcing steel strength, . . . slab on grade thickness and reinforcement, masonry infill details including masonry size type and compressive strength, complete foundation drawings including foundation types and sizes, comprehensive sections and details? (TBUP)." USACE responded to both questions by stating, "The Government has agreed to provide these drawings as noted below per Section 01 10 00 DESIGN CRITERIA, pg. 8, 3.4 FUNCTIONAL SPACES 'Drawings of Building 8609 will be provided to the bidders as part of the solicitation by USACE.'" The government also provided an identical response for questions 21, 25, 34, 38, 90, and 115 (App. supp. R4, tabs 359 at 6, 7, 12, 15, 18; 360 at 29, 30, 36). It is undisputed that the government did not provide the as-builts to the bidders.

11. Pre-bid question 146 sought, in part, clarification from the Government as to whether ASCE 41-06 or ASCE 41-13 "is applicable to the project." B-V responded confirming that "ASCE 41-13 applies and references ICSSC RP8 as per UFC 3-310-04-01 June 2013." (App. supp. R4, tab 359 at 19).

12. On September 15, 2014, Meltech submitted its technical and cost proposals for Building 8609 (JSOF (GB) ¶ 11)).

4

13. On September 29, 2014, USACE awarded Meltech Base Contract No. W912DR14-D-0021. (JSOF (GB) ¶ 13).

14. On September 30, 2014, USACE awarded Task Order Contract No. 0002 to Meltech for the renovation of Building 8609 at Fort Meade in the amount of $10,501,042. (JSOF (GB) ¶ 14)).

15. The Design Criteria (Section 01 10 00, Paragraph 3.4, "Functional Spaces") stated that "Barracks Building 8606, currently under construction, serves as a similar model or illustration for the design of this renovation and is referred to throughout this document for reference only. Drawings of Building 8609 will be provided to bidders as part of the solicitation by USACE." (JSOF (SC) ¶ 1)).

16. The Design Criteria (Section 01 10 00, Paragraph 6.6.5.b.) stated that the building "was constructed approximately 50 years ago and will probably not meet progressive collapse performance requirements. The structure will need to meet the criteria in the latest issue of UFC 4-023-03 (1 June 2013)." (JSOF (SC) ¶ 5)).

17. The Design Criteria (Section 01 10 00, Paragraph 6.6.6.) stated "[t]he Contractor has the option of performing non-destructive testing on the existing structural members to determine existing member and system capacities. All non-destructive testing shall be completed by the Contractor at no additional cost to the Government and shall be coordinated with the Contracting Officer prior to commencing work. Destructive testing shall not be permitted." (JSOF (SC) ¶ 6)).

18. On December 2, 2014, Meltech submitted Request for Information (RFI) 0001 requesting "any available CAD files for the building[.]" (JSOF (SC) ¶ 14)).

19. On December 14, 2014, USACE responded to RFI-0001 by stating: "The Government already provided you hardcopies of the… drawings in the RFP in the following Appendixes: - Appendix G: Drawings (conceptual designs showing spatial relationships as described in the RFP) -Appendix L: Preliminary Structural Design Analysis (Non-Destructive) Design from Building 8545 Government provide[d] you two 'CD's of CADD drawings (as references) for 8609 on December 11, 2014[.]" (JSOF (SC) ¶ 15)).

20. The Project Meeting Minutes reflect that as of January 15, 2015, Meltech had notified USACE that not having a full set of as-built drawings may delay the design of the project. At that time, USACE communicated that it was "still looking for as-builts for 8609." (JSOF (SC) ¶ 18)).

21. On February 3, 2015, Meltech notified USACE that it did not have a full set of as-builts for Building 8609 and that if these drawings were not available, Meltech

"will need to conduct destructive testing to ascertain the structural elements in the columns and flooring in order to continue the design of the building."  (JSOF (SC) ¶ 19)).

22.  On or about February 5, 2015, Meltech received a draft Statement of Work for destructive testing from its designer.  The Statement of Work stated that prior to destructive testing steel reinforcing bar finding equipment would be used in some areas of the building prior to destructive testing.  (JSOF (SC) ¶ 20)).

23.  On February 18, 2015, USACE noted that the parties had discussed destructive testing at the prior bi-weekly progress meeting and that USACE had requested "a work plan and a rough estimate related to the destructive testing" so that USACE could "evaluate the magnitude and the necessity of this effort."  Meltech then sent USACE the Draft Statement of Work that it had received from AECOM.  (JSOF (SC) ¶ 21)).

24.  On March 18, 2015, Meltech submitted a destructive testing proposal, including pricing information and drawings showing testing locations in the form of a proposed change order (JSOF (SC) ¶ 22)).

25.  On April 6, 2015, Meltech noted in correspondence with USACE, "Destructive testing is required to obtain additional information needed to potentially provide a more economical [progressive collapse] design using the tie force or an alternate allowable method."  Meltech further noted, "The destructive testing will allow the engineers to ascertain the existing conditions since we do not have a set of as-builts for the building. Without the information, a viable design cannot be created. Knowing the rebar locations, rebar used, lapping of rebar, and concrete strength is vital in the final designs."  (JSOF (SC) ¶ 23)).

26.  On April 7, 2015, USACE representatives internally discussed the issue of the progressive collapse design and possible destructive testing.  USACE's Mr. Kelvin Chan stated in an email to Mr. Melvin Damoudt, "If the contractor choose [sic] to utilize the existing beam/column frames, which requires a more precise information of the existing reinforcing, therefore the destructive testing.  The government should not be liable for the cost associate [sic] with the destructive testing."  (JSOF (SC) ¶ 24)).

27.  In this email, Mr. Chan also stated that "No complete set of structural drawings of Building 8609 were [sic] provided" to Meltech in association with the RFP (JSOF (SC) ¶ 25)).

28. On or about April 7, 2015, Meltech met with USACE's structural expert on the Project site to review solutions for meeting the most current UFC requirements and further discuss the need for destructive testing (JSOF (SC) ¶ 26)).

29. Preliminary work for destructive testing began on October 8, 2015. Meltech's subcontractor began destructive testing of Building 8609 columns, spandrel beams, interior beams, exterior beams/girders, interior beams/girders, pan joists, and slabs on October 20, 2015. The subcontractor completed on-site work for destructive testing on November 18, 2015, with repair to the holes made by destructive testing performed on November 20, 2015. (JSOF (SC) ¶ 33)).

30. On December 8, 2015, Meltech received test reports that identified existing structural concrete strength in several locations in Building 8609 to be less than 3,000 psi (JSOF (SC) ¶ 35)).

31. On December 18, 2015, Meltech notified USACE that its design team had utilized 3,000 psi as the strength of the structural concrete for its then-existing progressive collapse mitigation design based upon the information contained in ASCE 41-13 and that the compressive strength tests showing a lower strength for the structural concrete represented an unforeseen condition. Meltech requested direction on whether "looking at the structure less than 3,000 psi is an option." (JSOF (SC) ¶ 36)).

32. On January 15, 2016, Meltech notified USACE in two different letters that Meltech considered the presence of structural concrete under 3,000 psi to be a change/unforeseen condition that would delay the project and add additional design and construction costs (JSOF (SC) ¶ 37)).

33. On January 21, 2016, Meltech submitted RFI-0081 in which it stated the following: "On December 18, 2015, a call was had with USACE, Meltech, and URS [Meltech's design subcontractor] concerning the structural concrete strengths found in the destructive testing and coring of TBUP 8609. The call was requested by Meltech since the concrete strengths found were under the requirements outlined to be followed in the RFP. Kelvin Chan of USACE requested that Meltech should reengineer the Progressive Collapse based on this new data to show the new engineering requirements for the building. A determination of the results would be provided after the building was reengineered… Meltech is requesting that a RFP be provided to Meltech since this is a changed condition." (JSOF (SC) ¶ 38)).

34. On February 25, 2016, USACE rejected Meltech's position that the compressive strength of the structural concrete in Building 8609 was a change/unforeseen condition. USACE stated in part that "it is the responsibility of Meltech Inc. to analyze and evaluate the actual structural condition of Building 8609

7

to develop a design; and . . . construct all building retrofits as needed." (JSOF (SC) ¶ 40)).

DECISION

*Standard of Review for Motion for Summary Judgment*

The applicable provisions are well settled. Summary judgment is appropriate only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed. Cir. 1987); *Colonna's Shipyard, Inc.*, ASBCA No. 59987 *et al.*, 16-1 BCA ¶ 36,518 at 177,902. In the course of evaluation of a motion for summary judgment, "our task is not to evaluate or weigh competing evidence but only to determine whether a genuine disputed issue of material fact exists that is suitable for resolution at trial." *Ellis Env't Grp., LC.,* ASBCA No. 56227, 08-2 BCA ¶ 33,911 at 167,796; *Holmes & Narver Constructors, Inc.*, ASBCA Nos. 52429, 52551, 02-1 BCA ¶ 31,849 at 157,393 (quoting Anderson v. *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)); *Gen. Dynamics Corp.*, ASBCA Nos. 32660, 32661, 89-2 BCA ¶ 21,851 at 109,932. A material fact is one that may affect the outcome of the decision. *Liberty Lobby,* 477 U.S. at 248-49; *Colonna's Shipyard*, 16-1 BCA ¶ 36,518 at 177,902.

It is the moving party's burden to establish the absence of any genuine issue of material fact, and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment. *Mingus Constructors,* 812 F.2d at 1390-91; *Colonna's Shipyard*, 16-1 BCA ¶ 36,518 at 177,902. Once the moving party has met its burden of establishing the absence of disputed material facts, then the non-moving party must set forth specific facts, not conclusory statements or bare assertions, to defeat the motion. *Mingus Constructors,* 812 F.2d at 1390-91; *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626-27 (Fed. Cir. 1984); *Colonna's Shipyard*, 16-1 BCA ¶ 36,518 at 177,902. Where a party opposes summary judgment, it must support a clear challenge to demonstrate material facts in dispute. The non-moving party's evidence is to be believed, and all reasonable factual inferences are to be drawn in its favor. *Liberty Lobby,* 477 U.S. at 255; *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 148 (1970). On the other hand, if there is a failure to contradict the evidence, the Board may accept the moving party's undisputed version of the facts. *Sinil Co., Ltd.*, ASBCA Nos. 55819, 55820, 09-2 BCA ¶ 34,213 at 169,132.

It is the substantive law that identifies which facts are material. When there are disputes over facts that might affect the outcome of the case under the governing law, they will properly preclude the entry of summary judgment. *Liberty Lobby,* 477 U.S. at 248; *Osborne Constr. Co.,* ASBCA No. 55030, 09-1 BCA ¶ 34,083 at 168,512

8

("Substantive law dictates the parties' relative burdens and defines those 'material' facts that may affect the outcome of the particular cause of action.").

*Superior Knowledge*

In order to prevail on a claim of superior knowledge, the contractor must show proof that: "(1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor or did not put it on notice to inquire, and (4) the government failed to provide the relevant information." *Scott Timber Co. v. United States*, 692 F.3d 1365, 1373 (Fed. Cir. 2012) (quoting *Hercules, Inc. v. United States*, 24 F.3d 188, 196 (Fed. Cir. 1994)). A superior knowledge case requires a party to demonstrate that the "operative facts" alleged in the claim communicate to the contracting officer a disparity in knowledge between the parties at contract award of which the government was aware. *See H. N. Bailey & Assocs. v. United States*, 449 F.2d 376, 381 (Ct. Cl. 1971) (government did not possess superior knowledge at the time contract was executed); *AIW-Alton, Inc.*, ASBCA No. 47917, 95-2 BCA ¶ 27,875 at 139,066 (no superior knowledge when the government first learned of alternate manufacturing technique three years after contract award); *Bannum, Inc. v. United States*, 80 Fed. Cl. 239, 247 (2008) ("A superior knowledge claim ordinarily relates to knowledge regarding contractual specifications that the government failed to impart to a contractor prior to the contractor's agreement to undertake performance of a contract"); *Renda Marine, Inc. v. United States*, 66 Fed. Cl. 639, 721 (2005) ("When analyzing a claim that the government breached its duty to disclose superior knowledge, '([t]he court . . . must focus its inquiry on the government's knowledge at the time of contracting and its relationship to the contractor's lack of knowledge'")) (citations omitted). It is the pre-award disparity in knowledge that distinguishes the operative facts pertinent to superior knowledge allegations from those of other causes of action. *Lee's Ford Dock, Inc.*, ASBCA No. 59041, 14-1 BCA ¶ 35,679 at 174,639. The superior knowledge doctrine imposes a duty upon the government to disclose otherwise unavailable information vital to contract performance to the contractor. *Giesler v. United States*, 232 F.3d 864, 876 (Fed. Cir. 2000).

Meltech alleges that the government possessed superior knowledge regarding the progressive collapse design of this 1950's structure. They advance three main arguments to demonstrate that the USACE had vital information that would have impacted how it would proceed with the progressive collapse design. Meltech argues that the government not only knew before award that it did not have the as-built drawings, but it also knew pre-award that without the as-builts, bidders could only determine the psi of the concrete by conducting destructive testing. It also states that before award USACE knew that the concrete strength of building 8609 was below

3,000 psi. (App. mot. at 13-14). Meltech maintains that had USACE shared this information, the design necessary to prevent progressive collapse would have been different than what was planned and that the related costs, including costs for conducting destructive testing, would have been substantially less (app. mot. at 21; app. reply at 6). In support of appellant's position, it has put forth 49 facts outlining the basis for its conclusions (app. mot. at 5-13). The government admits some facts and successfully challenges others (gov't resp. at 4-18). Our analysis leads us to find 34 undisputed facts, however, not all are material to the questions before us. Unfortunately, the undisputed facts upon which appellant relies are insufficient to reach the conclusions appellant desires.

   a. *Are there any genuine issue(s) of material fact(s) as it relates to appellant's assertion that the USACE knew before award that it did not have the as-built drawings?*

Throughout its motion appellant maintains that there are no material facts in dispute with respect to the superior knowledge claim. In deciding whether any genuine issue of material fact exists that would preclude us from summary judgment, we have considered each of appellant's contentions and the government's corresponding responses. *See Mingus Constructors,* 812 F.2d at 1390-91; *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 826 (3d Cir. 2011) (The Court summarizing the undisputed facts, drawing all inferences in favor of the non-moving party). Appellant argues that at the time the government responded to pre-bid inquires requesting as-built drawings for building 8609, it knew that it did not have these drawings but did not share that information with bidders (app. mot. at 18-19). With each pre-bid inquiry the government responded by stating, "[t]he Government has agreed to provide these drawings as noted below per Section 01 10 00 DESIGN CRITERIA, pg. 8, 3.4 FUNCTIONAL SPACES 'Drawings of Building 8609 will be provided to the bidders as part of the solicitation by USACE.'" (SOF ¶ 10) This is the same language that is provided in the original solicitation, and was the response to several other questions presented to the government (SOF ¶¶ 10, 15, 19)[3]

While we recognize that the government concedes "that whether structural drawings were available is a 'vital fact affecting performance' prospective offerors would want prior . . . to submission of their proposals,"[4] that concession does not equate to the USACE knowledge that it did not have the as-built drawings (gov't resp.

---

[3] The government did provide drawings to bidders during the solicitation, but obviously not what appellant had hoped. (SOF ¶¶ 15, 19)

[4] The government does not concede that the structural strength contained in as-build drawings is **necessary** for the design of progressive-collapse mitigation (gov't resp. at 22-23)

10

at 22-23). The government challenges appellant's assertion, demonstrating that the support relied upon fails to identify any USACE employee having knowledge pre-award that the as-built drawings for building 8609 did not exist. (gov't resp. at 25-26) The government points to appellant's use of evidence relating to the Black & Veatch contract. While appellant relies upon this evidence to support its conclusion that the government knew it had no as-built drawings of building 8609, that evidence only demonstrates that Black & Veatch did not see the as-built drawings for several of the buildings undergoing renovation at Ft. Meade (gov't resp. at 25-26). Appellant uses the internal communications between Black & Veatch and USACE to demonstrate that at the time of these pre-bid responses that USACE did not possess as-built structural drawings. Appellant cites to the deposition transcript of Mr. Randal Gowler, Design Manager for Black & Veatch (R4, tab 722 at 22-23, 76, and 90-91). However, our reading of that testimony only reveals that Mr. Gowler did not recall seeing the as-built drawings. This fact does not support a finding that any USACE employee was aware that it did not have the as-built drawings prior to the USACE response to questions from prospective offerors. Similarly, the government challenges appellant's reliance on the contracting officer's testimony as proof of the government's knowledge pre-award. The testimony does little more than show that the contracting officer did not recall providing the drawings to Black and Veatch under a separate contract. (Tr. 8/186) Without more, we simply cannot make the leap appellant desires – that this evidence dictates a finding that the government knew it did not possess the drawings. We also cannot ignore that after award and after receiving appellant's request, the government continued looking for any as-built drawings for building 8609 (SOF ¶ 20). The fact that the government continued its search for the as-builts well after award demonstrates that the government did not know before award the as-built drawings were not available.

Finally, appellant's argument is particularly perplexing because it asserts on the one hand that the government knew that it did not have the as-built drawings before award yet promised to provide the as-built drawings to prospective bidders after award. Meltech contends that the language in the responses to pre-bid inquiries meant that the government not only had the drawings in its possession but that it "very reasonably concluded" that the government would provide the as-builts after award (app. mot. at 13, 20; app. reply at 8-9). We do not see how the assertion that the government acted in bad faith -- knowing it did not have the drawings, yet cajoling bidders into believing that the as-builts would be provided after award -- speaks to appellant's claim of superior knowledge. Even if it did, we determine that appellant's interpretation of the wording relied upon to reach its conclusion that the as-builts would be provided sometime after award is unreasonable.[5]

---

[5] Even if we conclude that the language in the solicitation is susceptible to more than one reasonable interpretation, the fact that the solicitation period was ending, and Meltech had not received the drawings it expected, specifically the as-built

b. *Are there any genuine issue(s) of material fact(s) as it relates to appellant's assertion that the USACE knew that destructive testing was necessary?*

Appellant also asserts in its motion that the government knew that absent the as-built drawings, destructive testing was the only method that could be used to determine the actual strength of the existing structural concrete. Meltech maintains that it had three choices in proceeding with the design required under the contract: (1) using the as-built drawings, (2) conducting destructive testing, and (3) assuming a 3,000 psi concrete strength. It maintains that these were the "only practical way to determine the as-built condition of the existing concrete" in building 8609 (app. mot. at 3). The government challenges Meltech's contention and states that other methods are available to determine the strength of the concrete (govt. mot. at 2). The government argues that Meltech knew destructive testing was not allowed under this contract and that "non-destructive testing" was one of the methods that could be used to determine the strength of the concrete (SOF ¶ 17). If non-destructive testing provides the information necessary for the design, then neither the as-builts nor the destructive testing requirement is vital information. Appellant has not presented any undisputed facts proving that non-destructive testing is ineffective in determining concrete strength. There is, however, evidence in this record that other methods aside from destructive testing can be used to determine the concrete strength (R4, tab 88 at 2-3).

Appellant maintains that without as-built drawings, Meltech had to perform destructive testing to determine the strength of the existing concrete and sought government approval to conduct the destructive testing. (app. mot. at 18; SOF ¶¶ 21-25) As support for its conclusion, Meltech states that "on prior TBUP projects destructive testing was required and performed by the contractors and modifications were awarded by USACE" (app. mot. at 18). While the citations identified by appellant identify that destructive testing occurred on other contracts, they do not support appellant's contention that the government was aware that destructive testing was required. Nor does it support the idea that the only alternative and effective way to determine the concrete strength was through destructive testing (app. mot. at 19-20). The evidence cited by appellant for the extrapolation that "USACE was aware from

---

drawings, the absence of those drawings should have raised a significant enough question that appellant should have inquired of the government before submitting its bid. *See Interstate Gen. Gov't Contractors, Inc. v. Stone*, 980 F.2d 1433, 1435 (Fed. Cir. 1992); *Newsom v. United States*, 676 F.2d 647, 650 (Ct. Cl. 1982) (an ambiguity is patent if it is "so glaring as to raise a duty to inquire"). Had appellant made an inquiry, any misunderstanding over the availability of as-built drawings could have been corrected prior to the submission of appellant's proposal.

prior TBUP projects that destructive testing would be necessary to determine the compressive strength of the structural concrete in Building 8609 because it was required in the prior TBUP renovations" is unsubstantiated (app. mot. at 9). As the government points out, the citation to the testimony of the ACO suggests only that destructive testing was performed on some of the previous TBUP renovations; that there were modifications on two previous TBUP renovations to allow destructive testing, and that he understood from Meltech that it wanted to perform destructive testing because no structural as-built drawings were provided (SOF ¶ 25). The government effectively demonstrates that the documentation relied upon by appellant does not provide the results of the destructive testing and, ultimately, does not support the conclusion that the government knew that destructive testing was required (gov't resp. at 10-11, 27). Moreover, the government's structural expert, Mr. Kent Morey, P.E., provided insight into several types of non-destructive testing identified by the American Concrete Institute as methods that could have been used to obtain an estimate of the concrete compressive strength (R4, tab 88). Mr. Morey was qualified as an expert in the area of structural engineering and structural retrofitting of existing buildings (tr. 9/157). And, while he was not designated as an expert in progressive collapse mitigation or destructive/non-destructive testing, his years of experience in this field and his familiarity with the use of testing for structural retrofitting provided sufficient conflicting evidence to Meltech's conclusions that "destructive testing was required." (Tr. 9/182-84; R4, tab 88) The government points to reliable evidence in the record that conflicts with appellant's contentions about destructive testing and the government's knowledge that "destructive testing was the only way to determine the concrete strength." Evidence related to buildings 8478 and 8479 demonstrates that non-destructive testing was used to determine the concrete strength for purposes of the progressive collapse design. (Gov't resp., ex. at 1-3).

Nor is there sufficient evidence presented by Meltech that the designer would not provide a signed set of documents without either structural as-built drawings or the destructive testing results (app. supp. R4, tab 393). The Government agrees that on February 12, 2015, a Meltech representative communicated to USACE's Project Engineer that Meltech's designer "would not provide a signed set of documents without fully understanding the verification of framing components" (gov't resp. at 10). This communication does not, however, equate to proof of a practice that designers would not certify and sign design plans without those two conditions being met. More importantly, this communication does not result in a finding that USACE was aware of this at the time the proposals were due, and that destructive testing was necessary. While appellant may have presented facts that destructive testing is an effective method to determine the concrete strength of existing buildings, it does not prove that destructive testing was the only reliable method to determine the structural strength of existing concrete.

13

c. *Are there any genuine issue(s) of material fact(s) as it relates to appellant's assertion that the USACE knew before award that Building 8609 had a compressive strength of less than 3,000 psi?*

We now address the third component of Meltech's argument that the government withheld vital information, i.e., the "USACE knew the strength of the concrete in Building 8609 was likely below the 3,000 psi threshold presumed in the design standards incorporated into the Contract" (app. mot. at 2). The parties agree that ASCE 41-13 was incorporated in the contract, identifying that the compressive strength for a building the age of Building 8609 would be at least 3,000 psi (SOF ¶ 11). However, the destructive test performed by Meltech revealed that the actual compressive strength of the structural concrete was less than 3,000 psi (app. mot. at 20-21). Meltech maintains that "prior to the start of the Building 8609 project USACE knew, as a result of destructive testing on earlier TBUP projects, that the structural concrete in Building 8609 had a compressive strength of less than the 3,000 psi indicated in the standards it incorporated into the RFP and which it required Meltech to utilize for its design work" (app. mot. at 9). The government challenges Meltech's inference, arguing that the statement is not supported by the cited documents or an affidavit (gov't resp. at 11). While the cited document shows that destructive testing was done in some of the other TBUP buildings, the document does not contain the testing results. Without more evidence showing that the government had knowledge of the results of the testing, we can only conclude that destructive testing was performed on other TBUP buildings – we cannot determine the results of the destructive testing. We simply cannot find from the support relied upon by the appellant, that the government knew prior to award that the existing concrete of building 8609 was below 3,000 psi.

In deciding a motion for summary judgment, our task is not to resolve factual disputes but to ascertain whether material disputes of fact are present. *Gen. Dynamics Corp.*, 89-2 BCA ¶ 21,851. Summary judgment cannot be granted where conclusions are based upon assumptions unsupported by the factual record. In opposing Meltech's motion for summary judgment, the government has shown that there are disputes of material fact on what the government knew before award and what, if any, representations were made. These issues ultimately affect the reasonableness of Meltech's overall claim of whether there was vital information that was withheld by the government. As the case now stands, material facts are in dispute relating to what the government knew prior to award. We do not determine here whether the appellant's superior knowledge claim fails, only that there are material facts essential to the elements of a superior knowledge claim that are disputed.

14

<u>CONCLUSION</u>

For the reasons stated above, appellant's motion for summary judgment is denied.

Dated: November 25, 2024

STEPHANIE CATES-HARMAN
Administrative Judge
Armed Services Board
of Contract Appeals

I <u>concur</u>

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63556, Appeal of Meltech Corporation, Inc., rendered in conformance with the Board's Charter.

Dated: November 25, 2024

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

15